JOHN D. WATTS *v.* HEATHER CHITTENDEN
(AC 29626)

Lavine, Robinson and Lavery, Js.

Argued January 22—officially released June 30, 2009

*Michael S. Hillis*, for the appellant (defendant).

*James F. Sullivan*, for the appellee (plaintiff).

*Opinion*

ROBINSON, J. The defendant, Heather Chittenden, appeals from the judgment of the trial court in favor of the plaintiff, John D. Watts, on his claim of intentional infliction of emotional distress. On appeal, the defendant claims that the court improperly (1) found that she failed to prove a statute of limitations defense, (2) found that she failed to prove her privilege defense and (3) awarded lost wages to the plaintiff. We agree with the defendant's first claim and reverse the judgment of the trial court.

The following facts, as found by the court, and procedural history are relevant to our resolution of the defendant's appeal. The plaintiff and the defendant are former husband and wife. They were married in July, 1993; however, the defendant filed a dissolution of marriage action in the Superior Court in March, 1999. During the course of the marriage, the parties had two daughters, born in 1995 and 1996. Following the dissolution, the defendant was granted joint custody and visitation rights. Several days before the dissolution action was filed, the defendant transferred her children to a new pediatrician. Specifically, the children saw Janet Murphy, a nurse practitioner, whom the defendant, also a nurse practitioner, had met while a student in a class taught by Murphy on the subject of sexual molestation of children.

At approximately 10:30 p.m. on June 3, 1999, the defendant called the department of children and families (department) to report that her eldest daughter had been abused sexually by the plaintiff. These allegations were then relayed by the department to the state police. The same report was also made by the defendant to Dawn Torres, a pediatrician. Thereafter, on June 10, 1999, the defendant met with Detective Anthony Buglione and Detective James McGlynn of the state police and reiterated her report that her daughter had been abused sexually by the plaintiff. She gave a five page written statement to the police providing details of her claims. Following this report, the state police contacted the plaintiff and requested pubic hair samples to be used in connection with the criminal investigation. On July 1, 1999, the investigation concluded in the absence of any evidence to suggest that the plaintiff was abusing his daughter.

On July 21, 1999, McGlynn received another report from the department, which was based on new allegations made by the defendant regarding the plaintiff's

abuse of their eldest daughter. On August 19, 1999, the defendant told McGlynn that the plaintiff continued to abuse their daughter, and, as a result, the investigation was reopened. During the course of the investigation, the daughter was evaluated by the Yale Child Sexual Abuse Clinic at Yale-New Haven Hospital (clinic). The clinic reported that the daughter indicated repeatedly during interviews that the plaintiff had not abused her. She did relate, however, that the defendant had been touching her vaginal area and saying, "this is what daddy does." The investigation stemming from this complaint was closed on January 11, 2000.

Shortly thereafter, on January 19, 2000, the department received a report from Livia Orsis-Abdo, a physician in Southport, who stated that she had been told by the parties' youngest daughter that the plaintiff had abused her sexually. As a result, the investigation against the plaintiff was reopened once again. The police eventually concluded that there was no evidence to support the allegations against the plaintiff but that there was substantial evidence that the defendant had sexually abused her two daughters while telling them that it "was what daddy [did]."

As a result of the investigation, the defendant was arrested and charged in a substitute information with two counts of risk of injury to a child in violation of General Statutes (Rev. to 1999) § 53-21 (1) and (2), false reporting of an incident in violation of General Statutes (Rev. to 1999) § 53a-180 (a) (3) (A), false statement in the second degree in violation of General Statutes § 53a-157b, attempt to commit malicious prosecution in violation of General Statutes §§ 53a-49 (a) (2) and 53-39, and sexual assault in the fourth degree in violation of General Statutes (Rev. to 1999) § 53a-73a (a) (1). On April 11, 2002, the defendant pleaded guilty, as a part of a plea agreement, to falsely reporting an incident and attempt to commit malicious prosecution. In the

statement of facts read into the record by the prosecutor, the defendant acknowledged that the allegations of sexual abuse asserted against the plaintiff were false and that the defendant made the false reports in an effort to have the plaintiff arrested. On May 30, 2002, the defendant was sentenced to a term of one year incarceration, execution suspended, and three years probation on each count.

Following her guilty plea on April 11, 2002, the defendant made repeated accusations to family therapists regarding the plaintiff's continuing sexual abuse of his daughters. Specifically, in 2004, she told Nina Rossamondo, a family therapist, that the plaintiff had abused sexually one or more of his children. In May, 2006, she also told Peter Kossef, a family therapist, that the plaintiff had molested the eldest daughter at least once.

On August 29, 2005, the plaintiff filed a one count complaint sounding in intentional infliction of emotional distress. The defendant filed an answer on October 20, 2005, in which she asserted as a special defense that the action was time barred under the statute of limitations. The plaintiff filed a reply, denying this special defense on May 22, 2006. On June 11, 2007, the plaintiff sought, and was granted, request for leave to amend his complaint to conform the pleadings to the proof by asserting the specific manner in which the defendant's tortious conduct continued to 2006. Subsequently, the defendant amended her special defenses on September 20, 2007, to assert that the statements she made were privileged and that the claims were barred by the statute of limitations. The plaintiff filed a general denial to the defendant's amended special defenses on October 31, 2007.

A trial before the court was conducted on May 1 and 2, June 11 and September 20, 2007. The court found in favor of the plaintiff on January 25, 2008, and the

defendant then filed the present appeal on February 13, 2008. Additional facts will be set forth as necessary.

I

The defendant first argues that the court improperly concluded that the plaintiff's claim was not time barred. Specifically, she maintains that the plaintiff did not submit any evidence of actionable conduct within the period of time prescribed to bring a claim for intentional infliction of emotional distress. Additionally, the defendant argues that the continuing course of conduct doctrine does not serve to toll the applicable statute of limitations because it was not pleaded properly in avoidance and does not have a place in the factual context of this case.

We begin our analysis by setting forth the relevant standard of review and legal principles. "The question of whether a party's claim is barred by the statute of limitations is a question of law, which this court reviews de novo." *Giulietti* v. *Giulietti*, 65 Conn. App. 813, 833, 784 A.2d 905, cert. denied, 258 Conn. 946, 947, 788 A.2d 95, 96, 97 (2001). Here, the plaintiff's claim is governed by the tort statute of limitations set forth in General Statutes § 52-577. "Section 52-577 is a statute of repose in that it sets a fixed limit after which the tortfeasor will not be held liable and in some cases will serve to bar an action before it accrues. . . . General Statutes § 52-577 provides: No action founded upon a tort shall be brought but within three years from the date of the act or omission complained of. This court has determined that [§] 52-577 is an occurrence statute, meaning that the time period within which a plaintiff must commence an action begins to run at the moment the act or omission complained of occurs. . . . Moreover, our Supreme Court has stated that [i]n construing our general tort statute of limitations, General Statutes § 52-577, which allows an action to be brought within three

years from the date of the act or omission complained of . . . the history of th[e] legislative choice of language precludes any construction thereof delaying the start of the limitation period until the cause of action has accrued or the injury has occurred. . . . The three year limitation period of § 52-577, therefore, begins with the date of the act or omission complained of, not the date when the plaintiff first discovers an injury." (Citation omitted; internal quotation marks omitted.) *LaBow* v. *Rubin*, 95 Conn. App. 454, 468–69, 897 A.2d 136, cert. denied, 280 Conn. 933, 909 A.2d 960 (2006).

It should be noted from the outset that the court's conclusion that the plaintiff's claim was not barred by the statute of limitations was premised on two intertwined bases. First, the court determined that that statute of limitations was tolled by virtue of the defendant's continuing course of conduct and did not begin to run until the defendant admitted that her accusations were false on April 11, 2002; therefore, the plaintiff had until April 11, 2005, to assert his claim. Before this time expired, the court concluded that the occurrence of a second event served to toll the statute of limitations once again. Specifically, the court determined that the statute was tolled by virtue of the defendant's bankruptcy petition, which was filed on April 8, 2005. On appeal, the defendant does not offer any argument related to this second tolling event; rather, the focus of her argument is that the court concluded improperly that the continuing course of conduct applied to toll the statute of limitations in the first place.

The continuing course of conduct doctrine is an oft-cited principle in our jurisprudence, and a review of this authority indicates that the application of the doctrine is premised necessarily on the existence of a duty in effect at the time of the original wrong. "To support a finding of a 'continuing course of conduct' that may toll the statute of limitations there must be evidence of the

breach of a duty that remained in existence after commission of the original wrong related thereto. That duty must not have terminated prior to commencement of the period allowed for bringing an action for such a wrong." *Fichera* v. *Mine Hill Corp.*, 207 Conn. 204, 209, 541 A.2d 472 (1988). "The existence of a duty is a question of law and only if such a duty is found to exist does the trier of fact then determine whether the defendant violated that duty in the particular situation at hand. . . . Our view of that legal question is plenary, and the plaintiff's claim rises or falls on whether such a continuing duty exists." (Internal quotation marks omitted.) *Smulewicz-Zucker* v. *Zucker*, 98 Conn. App. 419, 423–24, 909 A.2d 76 (2006), cert. denied, 281 Conn. 905, 916 A.2d 45 (2007).

In the present case, the court's decision to apply the continuing course of conduct doctrine carried an implicit finding that a duty originally existed; however, the context of this duty is not discussed. On review of the parties' respective arguments on this issue, we note that there appears to be a muddling of the requirements for the application of this doctrine.[1] As we have stated already, the existence of a duty at the time of the original wrong is a prerequisite.[2] If, and only if, this duty has

[1] The defendant does not argue explicitly that there was not an original duty in existence; rather, she argues that there is an absence of evidence of a special relationship or later wrongful conduct related to the original statements. Likewise, the plaintiff also appears to skip the first step of arguing the existence of an original duty and instead argues that the parties mutual relationship as parents to their children establishes "the type of special relationship . . . contemplated by the continuing course of conduct doctrine . . . ."

[2] A review of the jurisprudence underlying the continuing course of conduct doctrine reveals that the doctrine originally arose in the context of a negligence action or similar derivation, claims that necessarily involved a breach of a duty in existence at the time of the original wrong. See *Fichera* v. *Mine Hill Corp.*, supra, 207 Conn. 209–10. This interpretation of the doctrine is also supported by discussions of the policy underlying the doctrine. "The continuing course of conduct doctrine reflects the policy that, during an ongoing relationship, lawsuits are premature because specific tortious acts or omissions may be difficult to identify and may yet be reme-

been found to exist, there are two situations, as delineated by our Supreme Court, that would support a finding that the duty continued after cessation of the "act or omission" complained of. Specifically, the court stated: "Where we have upheld a finding that a duty continued to exist after the cessation of the 'act or omission' relied upon, there has been evidence of either a special relationship between the parties giving rise to such a continuing duty or some later wrongful conduct of a defendant related to the prior act." *Fichera* v. *Mine Hill Corp.*, supra, 207 Conn. 210. Thus, there must be a determination that a duty existed and then a subsequent determination of whether that duty is continuing.

This court's analysis in *Smulewicz-Zucker* v. *Zucker*, supra, 98 Conn. App. 419, is particularly instructive to our resolution of this issue because it shares many factual similarities with the present case. In *Smulewicz-Zucker*, this court addressed the application of the continuing course of conduct doctrine to a plaintiff's claim that she suffered emotional distress as a result of her former husband's conduct that occurred between 1994 and 1998. Id., 422. Her claim stemming from this conduct was brought in 2001, and the court concluded that the continuing course of conduct doctrine did not apply to toll the statute of limitations for any conduct before 1998. Id., 424–25. On appeal, this court rejected the

died. . . . For example, the doctrine is generally applicable under circumstances where [i]t may be impossible to pinpoint the exact date of a particular *negligent act or omission* that caused injury or where the *negligence* consists of a series of acts or omissions and it is appropriate to allow the course of [action] to terminate before allowing the repose section of the statute of limitations to run . . . ." (Emphasis added; internal quotation marks omitted.) *Navin* v. *Essex Savings Bank*, 82 Conn. App. 255, 262–63, 843 A.2d 679, cert. denied, 271 Conn. 902, 859 A.2d 563 (2004); *Sanborn* v. *Greenwald*, 39 Conn. App. 289, 295–96, 664 A.2d 803, cert. denied, 235 Conn. 925, 666 A.2d 1186 (1995). Accordingly, it stands to reason that the original application assumed the existence of a duty, and further analysis of the doctrine focused on the circumstances that indicated the continuing existence of the original duty.

plaintiff's argument that the continuing course of conduct doctrine can be premised on a purported duty arising from a spousal relationship, particularly when this relationship was terminated prior to the time frame in question. Id., 425. Similarly, in the present case, we can find no authority to support the plaintiff's position that the continuing course of conduct doctrine applies in the context of an alleged duty that arises simply because of the existence of a relationship between the parents of minor children.

In the absence of a breach of a cognizable duty, we conclude that the court improperly applied the continuing course of conduct doctrine to toll the statute of limitations.[3]

## II

The defendant next argues that the court improperly concluded that the statements she made to family therapists in 2004 and 2006 were not privileged. She maintains that the statements were made during court-ordered therapy sessions and should be considered absolutely privileged because they were made during the course of a judicial proceeding. We are not persuaded.

In Connecticut, "[t]he class of absolutely privileged communications is narrow, and practically limited to legislative and judicial proceedings, and acts of State." (Internal quotation marks omitted.) *Lega Siciliana Social Club, Inc.* v. *St. Germaine,* 77 Conn. App. 846, 855, 825 A.2d 827, cert. denied, 267 Conn. 901, 838 A.2d 210 (2003). "It is well settled that communications uttered or published in the course of judicial proceedings are absolutely privileged so long as they are in

---

[3] In light of this conclusion, we need not reach the second stage of the analysis, which requires a determination that the duty is continuing as evidenced by a special relationship or later wrongful conduct related to the prior act.

some way pertinent to the subject of the controversy. . . . The effect of an absolute privilege is that damages cannot be recovered for a defamatory statement even if it is published falsely and maliciously . . . . The policy underlying the privilege is that in certain situations the public interest in having people speak freely outweighs the risk that individuals will occasionally abuse the privilege by making false and malicious statements." (Internal quotation marks omitted.) Id., 855–56; see also *Petyan* v. *Ellis*, 200 Conn. 243, 245–46, 251–52, 510 A.2d 1337 (1986). "Whether a communication is published in the course of a judicial proceeding, so as to obtain the benefit of the absolute privilege, is a question of law for the court to decide, and our review is, therefore, plenary." *McManus* v. *Sweeney*, 78 Conn. App. 327, 334, 827 A.2d 708 (2003).

A review of the record reveals that the court found that the defendant failed to prove her special defense asserting privileged communications on the basis of its conclusion that her statements to the therapists were not made in the course of a judicial proceeding. On appeal, the defendant emphasizes that the comments were made during court-ordered sessions and maintains that this constitutes a "judicial proceeding."

A resolution of this issue requires a discussion of what constitutes judicial proceedings. "The judicial proceeding to which the immunity attaches has not been defined very exactly. It includes any hearing before a tribunal which performs a judicial function, ex parte or otherwise, and whether the hearing is public or not. It includes for example, lunacy, bankruptcy, or naturalization proceedings, and an election contest. . . . This privilege extends to every step of the proceeding until final disposition. . . . [L]ike the privilege which is generally applied to pertinent statements made in formal judicial proceedings, an absolute privilege also attaches

to relevant statements made during administrative proceedings which are quasi-judicial in nature." (Internal quotation marks omitted.) *McManus* v. *Sweeney*, supra, 78 Conn. App. 332, quoting *Petyan* v. *Ellis*, supra, 200 Conn. 246.

Here, the defendant does not offer any argument or legal analysis to support the application of this definition of "judicial proceeding" to include statements made to a therapist pursuant to a court order for the couple to seek counseling.[4] The only authority cited by the defendant in support of her argument is *McManus* v. *Sweeney*, supra, 78 Conn. App. 327, which provides the definition of a judicial proceeding set forth previously and represents a case that falls clearly within the definition's parameters. See id. (statement made by court-appointed attorney requesting investigation of plaintiff's conduct as it related to Probate Court proceeding subject to absolute privilege). The defendant argues that her statements are subject to an absolute privilege because the therapists had more of a direct interest in the family court proceeding than the recipient of the attorney's comment in *McManus*; however, this attempt to correlate her case to the holding in *McManus* is without merit because the recipient's interest in the proceeding is not the basis of the privilege. Accordingly, we are not persuaded by her argument.

III

The defendant's final claim is that the court improperly awarded lost wages to the plaintiff. In light of our conclusion that the continuing course of conduct doctrine was improperly applied under the facts of this case, we need not reach the issue of whether the court properly awarded damages, as this will necessarily be reconsidered on remand.

[4] According to the defendant's testimony, the purpose of this court order was "to reunify the children and the mother through family therapy."

The judgment is reversed and the case is remanded for further proceedings according to law.

In this opinion LAVERY, J., concurred.

LAVINE, J., concurring. I agree with the majority that the continuing course of conduct doctrine does not operate to bring the claims of the plaintiff, John D. Watts, within the statute of limitations; General Statutes § 52-577; given the facts of this case and the present state of our law. I write separately to stress that this case is confined to its facts and that in appropriate cases, particularly those involving ongoing abusive relationships, a more flexible application of the doctrine is warranted.

Statutes of limitation serve numerous salutary purposes. They (1) prevent the enforcement of stale or fraudulent claims, (2) aid in the search for truth that may be impaired by loss of evidence, fading memories and the disappearance of documents and (3) advance the finality of litigation. *Navin* v. *Essex Savings Bank*, 82 Conn. App. 255, 260–61, 843 A.2d 679, cert. denied, 271 Conn. 902, 859 A.2d 563 (2004).

When an intentional tort involving ongoing allegations of child sexual abuse in the context of a custody dispute is involved, however, strong countervailing concerns exist. The general policy of encouraging lawsuits to be brought at an early date must be weighed against the adverse consequences of fomenting litigation in highly charged family cases involving minor children. I acknowledge that this court has declined to apply the continuing course of conduct doctrine in an action for intentional infliction of emotional distress, concluding that no continuing duty existed on the basis of a former husband and wife relationship. *Smulewicz-Zucker* v. *Zucker*, 98 Conn. App. 419, 423–25, 909 A.2d 76 (2006), cert. denied, 281 Conn. 905, 916 A.2d 45 (2007). The

practical reality, however, is that even if former spouses do not have a legal duty to one another that brings the continuing course of conduct into play, former spouses, as parents, do have a continuing legal obligation to protect and to promote the best interests of their minor children.

Rather than commence an action the first time the defendant, Heather Chittenden, made false allegations of sexual abuse in 1999, the plaintiff did what any responsible person would do by allowing various authorities—the department of children and families, the state police, the Yale Child Sexual Abuse Clinic—to investigate the allegations. I do not dispute the majority's conclusion that, given the facts of this case and the current state of our law, the plaintiff waited too long to bring the action. Requiring him to have brought the action at the time the first allegation of sexual abuse was made, however, has serious adverse consequences from a public policy standpoint. Had he brought suit as soon as the false allegations were made, it would have made resolution of the underlying dissolution action more difficult, to the detriment of the parties and, more importantly, to the minor children. Such a requirement injects additional rancor, not to mention cost and aggravation, into an already acrimonious and emotional situation. In cases such as this, parties who are attempting to reach an accommodation involving their minor children should be encouraged to work together, not to sue each other. "Whether we want to encourage suits based on these distressful words and acts, and perhaps destroy the underlying relationship in the process, is debatable. By allowing the postponement of suits premised on conduct arising in the course of committed relationships, application of the continuing violations doctrine gives the parties an ample opportunity to ride out tough roads together." K. Graham,

"The Continuing Violations Doctrine," 43 Gonz. L. Rev. 271, 307 (2007-2008).[1]

Although this case does not involve ongoing abusive conduct within a marriage, or other committed relationship, it does involve sustained abusive conduct within the context of an ongoing relationship between former spouses, both of whom retain responsibility for protecting their minor children from harm, emotional and otherwise. This case therefore resembles, in significant respects, cases in which courts have taken a flexible, pragmatic approach when evaluating continuing course of conduct claims in domestic violence or domestic abuse cases. See, e.g., *Pugliese* v. *Superior Court*, 146 Cal. App. 4th 1444, 1452, 53 Cal. Rptr. 3d 681 (recognizing that notwithstanding "the difficulty a spouse or ex-spouse may have in defending against domestic violence cases, the continuing tort doctrine seems especially applicable in such cases"), review denied, No. S150513, 2007 Cal. LEXIS 3642 (Cal. April 11, 2007); *Curtis* v. *Firth*, 123 Idaho 598, 604, 850 P.2d 749 (1993) ("By its very nature this tort will often involve a series of acts over a period of time, rather than one single act causing severe emotional distress. For that reason, we recognize [that] the concept of continuing tort . . . should be extended to apply in other limited contexts, including particularly intentional infliction of emotional distress."), on appeal after remand, 125 Idaho 229, 869 P.2d 229 (1994); *Feltmeirer* v. *Feltmeirer*, 207 Ill. 2d 263, 284, 798 N.E.2d 75 (2003) (agreeing "with the growing number of jurisdictions that have found that the continuing tort rule should be extended to apply in cases of intentional infliction of emotional distress"); *Cusseaux*

---

[1] The continuing course of conduct doctrine raises extremely complex legal issues. Determining whether a series of acts should be viewed as discrete, or as part of a continuing course of conduct, is often an intractable problem. For a thoughtful discussion of what a continuing violation is and how courts analyze these claims, see K. Graham, supra, 43 Gonz. L. Rev. 271.

v. *Pickett*, 279 N.J. Super. 335, 345, 652 A.2d 789 (1994) ("It would be contrary to the public policy of this State, not to mention cruel, to limit recovery to only those individual incidents of assault and battery for which the applicable statute of limitations has not yet run. The mate who is responsible for creating the condition suffered by the battered victim must be made to account for his actions—*all* of his actions." [Emphasis in original.]). In some cases, a persuasive argument can be made that the statute of limitations should begin to run not when the first incident of abuse occurs, but only when the ongoing abusive conduct has ceased.

The majority opinion is decided on the specific facts of this case and should not be construed to apply to all cases involving claims of intentional infliction of emotional distress. How to apply the statute of limitations in other cases must be determined on the basis of the facts of each case.

For the foregoing reasons, I respectfully concur in the majority opinion.