D'ANGELO DEVELOPMENT AND CONSTRUCTION
CORPORATION *v.* STEVEN P. CORDOVANO ET AL.

SHARP COMPANY HOMES, INC. *v.* SARAH M.
CORDOVANO ET AL.
(AC 30151)

Bishop, Gruendel and Beach, Js.

Argued January 21—officially released May 18, 2010

*Brendan J. O'Rourke*, with whom, on the brief, were *Jennifer M. McGrath* and *Marianne F. Murray*, for the appellants-cross appellees (named defendant et al. in both cases).

*Richard E. Castiglioni*, with whom, on the brief, was *Jonathan J. Kelson*, for the appellee-cross appellant (plaintiff in the first case).

*Opinion*

BISHOP, J. The defendants, Steven P. Cordovano and Sarah M. Cordovano (the Cordovanos),[1] appeal from the judgments, following a trial to the court on two consolidated actions arising from a home construction contract, denying relief to all parties on all claims, counterclaims and cross claims.[2] On appeal, the Cordovanos

---

[1] Also named as defendants were Travelers Casualty & Surety Company of America and William Scott Duffield. They are not parties to these appeals.

[2] The Cordovanos appeal from the judgment denying all claims, counterclaims and cross claims that were still outstanding. In a prior proceeding, *Sharp Company Homes, Inc.* v. *Cordovano*, Superior Court, judicial district of Waterbury, Complex Litigation Docket, Docket No. X01-CV-02-4004186-S, the court found in favor of the Cordovanos on their counterclaims against Sharp Company Homes, Inc. The Cordovanos were awarded $125,718.48 in damages.

claim that the court improperly found that (1) they were not entitled to damages from the plaintiff D'Angelo Development and Construction Corporation (D'Angelo Development) for poor workmanship and material defects in the construction of their new home, (2) they failed to prove ascertainable losses in connection with their claim against D'Angelo Development under the Connecticut Unfair Trade Practices Act (CUTPA),[3] and (3) with respect to the negligence claim, Leonard D'Angelo, Jr. (D'Angelo), individually, did not owe them a duty of care.[4] On cross appeal, D'Angelo Development claims that the court improperly denied it recovery (1) pursuant to its claim for quantum meruit and (2) on its claims pursuant to two bonds that had been substituted for mechanic's liens subject to foreclosure. We affirm the judgments of the trial court.

The following facts as found by the court, and procedural history as revealed by the record, are relevant to our resolution of the issues on appeal. In July, 2000, the Cordovanos sought out D'Angelo, the president and sole employee of D'Angelo Development, for the purpose of purchasing property located at 134 Highland Avenue, Norwalk. D'Angelo had planned to build a home on speculation on the property but agreed to sell

---

[3] See General Statutes § 42-110a et seq.

[4] D'Angelo was named as a defendant in his individual capacity in an action initiated by Sharp Company Homes, Inc. See *Sharp Company Homes, Inc.* v. *Cordovano*, Superior Court, judicial district of Waterbury, Complex Litigation Docket, Docket No. X01-CV-02-4004186-S. In that action, the Cordovanos brought a cross claim against D'Angelo on a theory of negligence. The action by Sharp Company Homes, Inc., was later consolidated with the action initiated by D'Angelo Development. See *D'Angelo Development & Construction Corp.* v. *Cordovano*, Superior Court, judicial district of Waterbury, Complex Litigation Docket, Docket No. X01-CV-03-4004190-S. On February 9, 2007, Sharp Company Homes, Inc., withdrew its complaint against all of the defendants, and a default was entered against it with regard to the counterclaim filed by the Cordovanos. The claim before this court that relates to D'Angelo's duty of care, or lack thereof, stems from the Cordovanos' cross claim in the action by Sharp Company Homes, Inc.

the land to the Cordovanos on the condition that they retain D'Angelo Development to build a home for them on the property. D'Angelo and Steven Cordovano met five or six times to discuss the purchase and sale of the property prior to entering into a written agreement. D'Angelo represented that he had built many projects, including houses and shopping malls, and that he had experience working in his family's real estate business. On October 30, 2000, the Cordovanos and D'Angelo Development closed on the sale of the real property and signed an agreement calling for D'Angelo Development to build a home for the Cordovanos at that location. At no time prior to the conveyance of the real property or execution of the construction contract did D'Angelo Development comply with applicable requirements of the New Home Construction Contractors Act (act).[5]

---

[5] See General Statutes § 20-417a et seq. The act was originally adopted as Public Acts 1999, No. 99-246, subsequently codified as General Statutes § 20-417a et seq. At the time in question, Public Acts 1999, No. 99-246, § 4, as amended by Public Acts 2000, No. 00-132, § 4, subsequently codified as General Statutes (Rev. to 2001) § 20-417d, provided in relevant part: "(a) A new home construction contractor shall (1) prior to entering into a contract with a consumer for new home construction, provide to the consumer a copy of the new home construction contractor's certificate of registration and a written notice that . . . (C) advises the consumer to request from such contractor a list of consumers of the last twelve new homes constructed to completion by the contractor during the previous twenty-four months, or if the contractor has not constructed at least twelve new homes to completion during the previous twenty-four months, then a list of all consumers for whom the contractor has constructed a new home to completion during the previous twenty-four months, and to contact several individuals on the list to discuss the quality of such contractor's new home construction work . . . .

"(c) The written notice required in subsection (a) of this section shall be in capital letters . . . and may include a statement in substantially the following form . . .

"IN ADDITION, YOU ARE ADVISED TO DISCUSS WITH THE NEW HOME CONSTRUCTION CONTRACTOR:

"(1) WHETHER THE CONTRACTOR HAS A CUSTOMER SERVICE POLICY AND IF SO, THE IDENTITY OF THE PERSON DESIGNATED TO ASSIST YOU IN RESOLVING ANY COMPLAINT ABOUT THE CONTRACTOR'S WORK, AND

With respect to the construction contract, counsel for the Cordovanos utilized a form contract from the American Institute of Architects (AIA contract). Under the AIA contract, D'Angelo Development was responsible for furnishing the materials and providing the labor necessary to build the new home, and, in return, the Cordovanos agreed to pay for the costs of the material and labor furnished by D'Angelo Development, in addition to a contractor's fee equal to 20 percent of building and material costs.[6]

The Cordovanos hired an architectural designer, William Scott Duffield, and his firm, William Scott Duffield Architectural Design, to design their new home. Duffield was not, nor had he ever been, an architect or an engineer licensed in Connecticut or any other state. Steven Cordovano was aware that Duffield was not an architect, but, nevertheless, on September 8, 2000, the Cordovanos entered into an architectural design contract with Duffield. Despite listing him in the contract as the architect for the project, the Cordovanos never requested that Duffield perform the duties, which, under the AIA contract, were to be done by the architect. Specifically, Duffield did not review and approve progress payment requests from D'Angelo Development. He did not approve the materials that were to be used on the project, nor did he approve any proposed changes to the materials. Additionally, Duffield was not consulted regarding the formulation of a budget for the project or in preparing a schedule of values, which allocated the entire project cost among the various portions of the work to be done. D'Angelo never inquired, nor was he told, that Duffield was not an architect or an engineer.

"(2) WHETHER THE CONTRACTOR WILL HOLD YOU HARMLESS FOR WORK PERFORMED BY ANY SUBCONTRACTOR HIRED BY THE CONTRACTOR . . . ."

[6] This type of contract arrangement is referred to as a "cost-plus" agreement.

D'Angelo Development submitted the appropriate paperwork to obtain zoning approval, and construction began on the project in the first week of December, 2000. By that time Duffield had provided construction drawings, but they lacked essential particulars. His roof plan contained no dimension specifications, and his foundation plan did not provide the detail necessary to determine the proper placement of footing drains and expansion joints. D'Angelo Development, nevertheless, installed the footing drains and expansion joints, without specifications. Further, a site plan provided by Duffield lacked information regarding dry wells, elevations, specifications for construction and specifications for driveway substrate. Duffield did not prepare a drainage study, did not include dry wells in his plans and did not consider the topography, soil conditions, grade or water at the project site. He, also, did not submit the drawings for the interior trim until more than one year after D'Angelo Development and the Cordovanos had signed their construction agreement.

Cordovano personally selected Quality Construction (Quality) to do the framing for the new home. It framed the first floor walls and ceilings and the second floor walls but did not complete the job because it encountered problems with the roof, which included plans for a tower. Quality left the project on or about March 15, 2001. Acting on Duffield's recommendation, the Cordovanos entered into a contract with a second framing company, Sharp Company Homes, Inc. (Sharp), on April 5, 2001, to complete the framing for the project.[7] Sharp did not show up to the construction site for three weeks and when it did arrive, it failed to provide a sufficient number of workers to do the job. Sharp was subsequently discharged by Steven Cordovano.

[7] D'Angelo also signed the contract as "Builder" on behalf of D'Angelo Development.

D'Angelo Development, next, recommended that the Cordovanos hire Jose Albert DaSilva to complete the framing work, to install interior and exterior trim, and to perform other carpentry work. DaSilva began work on the project on or about May 28, 2001, and quickly encountered problems with Duffield's drawings. DaSilva took a number of steps, not called for in the specifications, in order to correct problems he perceived with the roof and tower.

In November, 2001, the Cordovanos moved into the home, even though the construction had not been completed and the certificate of occupancy had not yet been issued.[8] In January, 2002, D'Angelo Development received a $100,000 payment from the Cordovanos, which was the last payment that it received. This payment was made in a lump sum, without an application for payment having been submitted by D'Angelo Development pursuant to the terms of the parties' contract, and without any request from the Cordovanos that D'Angelo Development provide supporting details regarding the labor and materials. In February, 2002, the Cordovanos and D'Angelo met to discuss the outstanding balance claimed by D'Angelo Development but no further payments were made by the Cordovanos. D'Angelo Development ceased work on the project on May 6, 2002.

On June 10, 2002, the Cordovanos sent a letter to D'Angelo Development complaining about its work and including a list of claimed problems with the new home. The list did not contain a number of problems that were later alleged by the Cordovanos at the time of trial.[9]

---

[8] The certificate of occupancy was issued by the Norwalk building department on June 18, 2002.

[9] At trial, the Cordovanos complained of loose Sheetrock tape, wiggling toilets, scalding hot water from the pot filler and a flood in the kitchen, none of which were alleged in the June 10, 2002 letter.

Over the course of the project, D'Angelo Development billed the Cordovanos a total of $1,217,523.31, of which the Cordovanos paid $1,015,727.77. D'Angelo Development maintained at trial that it was still owed $159,305.85 based on the terms of the parties' contract. On July 31, 2002, D'Angelo Development filed two certificates of mechanic's liens with the town of Norwalk.[10] The first lien was to secure a balance of $72,606.59, which D'Angelo Development claimed was due as part of its contractor's fee under the AIA contract and for certain costs incurred under the agreement. The second was to secure $86,699.26, which D'Angelo Development claimed was due for unpaid costs for materials and services provided by its subcontractors under the agreement.

On July 21, 2003, D'Angelo Development commenced an action against the Cordovanos alleging breach of contract and quantum meruit, and seeking foreclosure of the two mechanic's liens. It also recorded two notices of lis pendens against the property on July 9, 2003. In response, the Cordovanos filed an answer, special defense and an eight count counterclaim.

Previously, in a complaint dated January 14, 2002, Sharp had set forth claims against the Cordovanos and D'Angelo.[11] On November 6, 2003, the Cordovanos filed their answer, special defenses and a five count counterclaim against Sharp. On May 10, 2004, the Cordovanos filed an amended cross claim against D'Angelo in the action by Sharp. Sharp subsequently withdrew its complaint against all of the defendants, and a default was entered against it at the commencement of trial with regard to the Cordovanos' counterclaim.[12]

[10] Both of the mechanic's liens were duly recorded in the Norwalk land records and notice was served on the Cordovanos.

[11] See footnote 4 of this opinion.

[12] See footnote 2 of this opinion, noting that the Cordovanos were awarded $125,718.48 in damages pursuant to their counterclaim against Sharp.

Following a hearing on the mechanic's lien action, the court, *Hon. William B. Lewis*, judge trial referee, ordered that the two certificates of mechanic's liens be deemed dissolved on the ground that Travelers Casualty & Surety Company of America (Travelers) had substituted appropriate bonds to cover the amount of the liens.[13]

On November 15, 2004, D'Angelo Development filed its amended complaint in which it sought recovery on the ground of breach of contract and quantum meruit. This complaint also included claims against the Travelers' bonds. In response, the Cordovanos filed an amended answer, special defenses and an eight count counterclaim. D'Angelo Development, in turn, filed an answer to the counterclaim denying its essential allegations and asserted special defenses. The cases, *D'Angelo Development & Construction Corp.* v. *Cordovano*, Superior Court, judicial district of Waterbury, Complex Litigation Docket, Docket No. X01-CV-03-4004190-S, and *Sharp Company Homes, Inc.* v. *Cordovano*, Superior Court, judicial district of Waterbury, Complex Litigation Docket, Docket No. X01-CV-024004186-S, were consolidated and tried before the court, *Cremins, J.*, on various dates in July and September, 2007. The court found that both parties to the AIA contract, D'Angelo Development and the Cordovanos, breached the contract and that because there was a mutual breach, "none

---

[13] The mechanic's lien release bond no. 103986495 was for the sum of $72,606.59. Bond no. 104130417 was in the amount of $86,699.26. The Cordovanos attempted to void the land contract and the AIA contract by filing an application to have the lien underlying the bond no. 104130417 declared invalid on the ground that D'Angelo Development violated the act. The trial court, *Hiller, J.*, denied the application and sustained the validity of the lien on the ground that the violations of the act did not relieve the Cordovanos of their contractual obligations. The Cordovanos appealed from the decision, and the Supreme Court affirmed the judgment of the trial court. *D'Angelo Development & Construction Co.* v. *Cordovano*, 278 Conn. 237, 897 A.2d 81 (2006).

of the parties [were] entitled to enforce the AIA contract or any alternative claim related to the AIA contract." This appeal and cross appeal followed. Additional facts will be set forth as necessary.

I

On appeal, the Cordovanos first claim that the court improperly concluded that they were not entitled to recover under their breach of contract claims due to a mutual breach of the AIA contract. Specifically, they claim that they should be entitled to damages because they did not commit a material breach of the contract but, rather, only neglected to enforce nonmaterial provisions of the contract meant for their own protection. We are not persuaded.

In its memorandum of decision, the court did not discuss the materiality of the various breaches of the AIA contract, nor did D'Angelo Development or the Cordovanos request an articulation from the court on the issue of materiality. Nevertheless, the court's denial of the Cordovanos' breach of contract claims implies that the court determined that their breaches were material and, as such, represented a bar to their recovery. Any other assumption by us on appeal would require a concomitant assumption that the court incorrectly applied the law to the facts it found. This we will not do. Thus, the question we face is whether the court properly determined that the Cordovanos had materially breached the AIA contract so as to prevent their recovery under its terms.

"The determination of whether a contract has been materially breached is a question of fact that is subject to the clearly erroneous standard of review. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and

firm conviction that a mistake has been committed."
(Citations omitted; internal quotation marks omitted.)
*Efthimiou* v. *Smith*, 268 Conn. 487, 493–94, 846 A.2d
216 (2004).

The following additional facts, as found by the court,
are relevant to our review of the Cordovanos' claim.
Prior to the execution of the AIA contract, D'Angelo
Development did not comply with the requirements
under the act.[14] Specifically, it did not provide the Cor-
dovanos with a copy of a certificate of registration
showing that it was a "new home construction contrac-
tor." It also did not provide written notice advising
the Cordovanos to (1) request a list of the last twelve
customers for whom new homes were constructed by
D'Angelo Development during the previous twenty-four
months and contact those customers to discuss the
quality of D'Angelo Development's work, (2) discuss
with D'Angelo Development whether it had a customer
complaint policy and who would be the contact person
in the event of a complaint, and (3) discuss with
D'Angelo Development whether it would hold the Cor-
dovanos harmless for work performed by any subcon-
tractor hired by D'Angelo Development. Neither
D'Angelo Development nor D'Angelo was registered
properly as a new home construction contractor, and
D'Angelo was not aware of the act or the registration
requirements until days before the construction con-
tract was executed.[15]

Throughout the course of the project, the Cordovanos
and D'Angelo Development ignored certain provisions
of the AIA contract. At the time the AIA contract was
executed, the Cordovanos paid the initial deposit as
required by the AIA contract but failed to supply any

[14] See footnote 5 of this opinion.

[15] D'Angelo Development did, apparently, receive its certificate of registra-
tion on November 2, 2000, three days after the AIA contract was executed.

construction drawings or specification books to D'Angelo Development as required by article 1 of the AIA contract. D'Angelo Development was responsible under the AIA contract to verify all measurements and was responsible for any corrections. Additionally, if supplementary drawings were needed, it was D'Angelo Development's responsibility to make requests for those drawings before any work was done. It failed to fulfill these obligations and, also, never established a schedule of progress for the project, which was required by the AIA contract. Both D'Angelo and Steven Cordovano were aware that the AIA contract required that written change orders be submitted when the construction plans were developed and modified but neither D'Angelo Development nor the Cordovanos complied with the change order system as set out in the AIA contract.[16] Also, the costs for changes were reimbursed, contravening article 8 of the AIA contract.

Additionally, even though the AIA contract contained a reference to a guaranteed maximum price, the parties never set such a price.[17] Further, D'Angelo Development did not provide applications for payments, invoices, check vouchers or any evidence of disbursements as required under article 12 of the AIA contract. Likewise, the Cordovanos did not require that D'Angelo Development submit any such applications or other evidence of disbursements prior to making payments. Even

[16] In one instance, Steven Cordovano decided, after construction was underway, that he wanted a full basement throughout the building rather than the previously planned, full and partial basement. No revised plans were provided for this change, and D'Angelo Development made the change without requiring that adequate plans be drawn up. It also did not request that a written change order be submitted, despite the fact that the AIA contract stated that it was D'Angelo Development's responsibility to request such a written change order.

[17] The land sale contract had an attachment, schedule E, that gave a preliminary estimate of $578,700. That price was set, however, before Duffield had submitted any drawings for the construction plan.

though the AIA contract called for materials and labor to be furnished by D'Angelo Development, the Cordovanos directly contracted for and paid for many of these expenses without objection from D'Angelo Development.[18] D'Angelo Development did not meet its obligations to solicit bids from subcontractors or to enter into written contracts with subcontractors, both of which were required under the AIA contract. The Cordovanos, also, did not require that any bids be solicited, nor did they require written contracts for subcontractors. D'Angelo Development did not keep adequate records of project expenses, despite the fact that D'Angelo knew the AIA contract required that detailed financial records be kept regarding such expenses.[19]

The court also found that D'Angelo was aware of many of the problems that occurred during the course of the project and brought them to the attention of Duffield and Steven Cordovano. The court noted that D'Angelo would set up meetings with Duffield, who would review the conditions at the site and produce revised drawings so that D'Angelo Development and the subcontractors could continue to work. Steven Cordovano was a party to many of these discussions.

Upon review of the record, we find ample support for the court's conclusion that the Cordovanos were not entitled to damages pursuant to the contract because of their failure to adhere to its terms. As the court set out at length in its memorandum of decision, the parties wholly ignored the AIA contract and failed to follow

---

[18] The Cordovanos directly paid for appliances, kitchen cabinets, bath vanities, faucets, fixtures, tile and marble materials, landscaping, railings, a garage door and an underground sprinkler. Additionally, they directly hired a mason, who did work in their kitchen, an exterior painter, an electric company and a pizza oven manufacturer and installer.

[19] This was particularly important because D'Angelo Development was being paid under a "cost-plus" arrangement; see footnote 6 of this opinion; and, therefore, did not have the same incentive to control costs as would likely be the case with a fixed price arrangement.

the system of checks and balances that it required. Despite contractual provisions to the contrary, change orders were never used, subcontractor work was performed without an adequate process for bidding the work, the accounting records were not maintained properly and the payment structure was ignored.[20] Additionally, the payments were never approved by any third party architect; in fact, the "architect" listed under the contract, Duffield, was not, in fact, an architect. The court also noted that despite language in the rider to the AIA contract clearly providing that the owner could require " 'evidence reasonably satisfactory to [the] Owner' " as a condition precedent to the making of any payment, the Cordovanos did not request any such evidence until the project was very far along and problems had already developed. In sum, the evidence at trial provided ample support for the court's conclusion that the parties operated outside of the contract, conducting their business as they pleased, and that it was only after things began to fall apart that the parties attempted to avail themselves of the protection of the contract that they had previously ignored. On the basis of the foregoing, we conclude that the court's determination that the Cordovanos materially breached the AIA contract was not clearly erroneous.

## II

The Cordovanos next claim that the court improperly determined that they could not recover damages pursuant to their CUTPA claim because they had failed to establish any ascertainable losses. Specifically, the Cordovanos claim that ascertainable losses were established through Steven Cordovano's testimony that if D'Angelo Development had made the disclosures

---

[20] Specifically, the parties did not abide by § 12.1.7 of the AIA contract, which provided a 0 percent retainage in regard to the contractor's fee, nor § 12.1.8, which required not less than 5 percent retainage for the subcontractors.

required under the act, they would not have hired D'Angelo Development and, thus, would not have suffered damages. We are not persuaded.

Our Supreme Court has previously explained that to prevail on a CUTPA claim, the plaintiff must prove, pursuant to General Statutes § 42-110b (a), that the defendant engaged in "unfair or deceptive acts or practices in the conduct of any trade or commerce"[21] and that as a result of the use of the act or practice prohibited by § 42-110b (a), the plaintiff suffered an "ascertainable loss of money or property."[22] *Neighborhood Builders* v. *Madison*, 294 Conn. 651, 657, 986 A.2d 278 (2010). "The language 'as a result of' requires a showing that the prohibited act was the proximate cause of the harm to the [complaining party]." *Abrahams* v. *Young & Rubicam, Inc.*, 240 Conn. 300, 306, 692 A.2d 709 (1997). "Whenever a consumer has received something other than what he bargained for, he has suffered a loss of money or property. That loss is ascertainable if it is measurable even though the precise amount of the loss is not known." *Hinchliffe* v. *American Motors Corp.*, 184 Conn. 607, 614, 440 A.2d 810 (1981). "Once a violation of the act has been established . . . our cases make clear that the homeowners still must prove that they have suffered an injury or actual loss in order to recover damages under CUTPA." (Internal quotation marks omitted.) *Campagnone* v. *Clark*, 116 Conn. App. 622, 633, 978 A.2d 1115 (2009).

There is no dispute that by holding itself out as a new home construction contractor prior to obtaining

[21] General Statutes § 42-110b (a) provides: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

[22] General Statutes § 42-110g (a) provides in relevant part: "Any person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by section 42-110b, may bring an action in the judicial district in which the plaintiff or defendant resides or has his principal place of business or is doing business, to recover actual damages. . . ."

a certificate of registration in accordance with General Statutes § 20-417b (a), and by not complying with the additional disclosure requirements prescribed by § 20-417d (a), D'Angelo Development committed a CUTPA violation as a matter of law.[23] Thus, the only question we must address is whether the court properly determined that the Cordovanos failed to meet the second requirement for recovering damages under CUTPA, which is proof that they suffered an ascertainable loss as a result of D'Angelo Development's CUTPA violation. We note that whether the Cordovanos suffered ascertainable losses as a result of D'Angelo Development's CUTPA violation is a question of fact, which we review under the clearly erroneous standard. See *A. Secondino & Son, Inc.* v. *LoRicco*, 215 Conn. 336, 344, 576 A.2d 464 (1990)..

On the basis of the record, we conclude that the court's finding that D'Angelo Development's CUTPA violation was not the proximate cause of any ascertainable loss to the Cordovanos was not clearly erroneous. On appeal, the Cordovanos have failed to establish a causal link between the CUTPA violation and the damages they allege that they have suffered. It is noteworthy that because D'Angelo Development committed a per se violation of CUTPA, the Cordovanos were not required to prove the existence of any unfair or deceptive acts. See General Statutes § 20-417g. Furthermore, the record does not disclose any. The lack of any deception on the part of D'Angelo Development, however, is relevant to our determination of whether the court correctly determined that the Cordovanos did not suffer damages as a result of the CUTPA violation. Our careful

[23] General Statutes § 20-417g provides: "A violation of any of the provisions of sections 20-417a to 20-417j, inclusive, shall be deemed an unfair or deceptive trade practice under subsection (a) of section 42-110b." Although § 20-417g was amended in 2006, that amendment has no bearing on this appeal. For convenience, we therefore refer to the current revision of § 20-417g.

review of the record reveals that the Cordovanos did not enter into an agreement with D'Angelo Development and work together with D'Angelo Development based on any acts of deception or unfairness by D'Angelo Development. Rather, the record is plain that the Cordovanos sought out D'Angelo with the intention of having D'Angelo Development build them a home. They were familiar with D'Angelo, as they lived in the same neighborhood as he did and had met with him on multiple occasions prior to the execution of the contract. There was no evidence to suggest that D'Angelo misled the Cordovanos as to his true identity or his professional experience or that he attempted to deceive them in any way. It is true that D'Angelo held D'Angelo Development out as a new home construction contractor despite not having a certificate of registration; however, D'Angelo Development did obtain the appropriate registration three days after the contract was signed and well before construction began on the project.[24] Furthermore, there was no evidence, outside of Steven Cordovano's own testimony, that had the Cordovanos known that D'Angelo Development did not have a certificate of registration, they would not have contracted with it. The Cordovanos were sophisticated consumers, having been involved in construction and renovation projects in the past, and sought out D'Angelo with the intent of contracting with him. It would require speculation to conclude that the Cordovanos would have acted differently had D'Angelo Development made the disclosures required by the act before the parties executed a written contract or even while construction was ongoing. In sum, even if we assume that the Cordovanos could show that they suffered some damages that arose from the AIA contract, because they failed to establish that those damages were a result of D'Angelo

[24] D'Angelo Development had been licensed by the state as a home improvement contractor since 1995.

Development's failure to provide the disclosures under the act, the court correctly determined that they failed to meet their burden of proving ascertainable losses as a consequence of the CUTPA violation. The court's finding in this regard was not clearly erroneous.

### III

The Cordovanos' final claim is that the court improperly found, in relation to their negligence claim, that D'Angelo did not owe them a duty of care in his individual capacity. We disagree.

Whether the court properly determined that D'Angelo did not owe a duty of care to the Cordovanos is a question of law for which our review is plenary. See *Watts* v. *Chittenden*, 115 Conn. App. 404, 411, 972 A.2d 770, cert. granted on other grounds, 293 Conn. 932, 981 A.2d 1077 (2009).

"The essential elements of a cause of action in negligence are well established: duty; breach of that duty; causation; and actual injury. . . . Contained within the first element, duty, there are two distinct considerations. . . . First, it is necessary to determine the existence of a duty, and [second], if one is found, it is necessary to evaluate the scope of that duty." (Internal quotation marks omitted.) *LePage* v. *Horne*, 262 Conn. 116, 123, 809 A.2d 505 (2002). "Although it has been said that no universal test for [duty] has ever been formulated . . . our threshold inquiry has always been whether the specific harm alleged by the plaintiff was foreseeable to the defendant. . . . Furthermore, [a] duty to use care may arise from a contract, from a statute, or from circumstances under which a reasonable person, knowing what he knew or should have known, would anticipate that harm of the general nature of that suffered was likely to result from his act or failure to act." (Citation omitted; internal quotation marks omitted.) *Precision Mechanical Services, Inc.* v.

*T.J. Pfund Associates, Inc.*, 109 Conn. App. 560, 564 n.4, 952 A.2d 818, cert. denied, 289 Conn. 940, 959 A.2d 1007 (2008). "Only if such a duty is found to exist does the trier of fact then determine whether the defendant violated that duty in the particular situation at hand. . . . If a court determines, as a matter of law, that a defendant owes no duty to a plaintiff, the plaintiff cannot recover in negligence from the defendant." (Internal quotation marks omitted.) *Neff* v. *Johnson Memorial Hospital*, 93 Conn. App. 534, 542, 889 A.2d 921 (2006).

The Cordovanos alleged in their cross claim in the action by Sharp that D'Angelo owed a duty to them to construct their new home in accordance with the architectural specifications and drawings, in a workmanlike manner and free from construction defects. The court subsequently concluded that the Cordovanos could not recover because they had failed to establish that D'Angelo owed them any such duty. The court based its determination on a trial court case, *State* v. *Maximus, Inc.*, Superior Court, judicial district of Hartford, Docket No. CV-07-5015239-S (June 4, 2008). In *Maximus, Inc.*, the plaintiff brought claims for breach of contract and for negligence. The defendant moved to strike the negligence claim on the ground that the complaint did not allege that the defendant breached any duty aside from its contractual duty. The court struck the negligence claim, finding that the plaintiff had failed to show that any duty was imposed on the defendant except for the duty to complete the contract properly.

The Cordovanos' negligence claim arises out of the contract between the Cordovanos and D'Angelo Development. They claim that D'Angelo owed them a duty to construct their home according to the specifications, in a workmanlike manner and without defects.

D'Angelo did not, however, contract with the Cordovanos to build their home. Prior to being sold, the property was in the name of D'Angelo Development, and it was sold by D'Angelo Development. The AIA contract was in the name of D'Angelo Development, and all of the payments made by the Cordovanos were made out to D'Angelo Development. D'Angelo signed the AIA contract on behalf of D'Angelo Development and supervised the project subject to his position as president of that corporation, but there was no evidence that he engaged in the project in his individual capacity. There is no question that a duty of care may arise out of a contract, but when the claim is brought against a defendant who is not a party to the contract, the duty must arise from something other than mere failure to perform properly under the contract.

In support of their negligence claim, the Cordovanos point to *Scribner* v. *O'Brien, Inc.*, 169 Conn. 389, 363 A.2d 160 (1975), in which our Supreme Court found a defendant liable for negligence in his individual capacity despite his being an agent of a corporate entity. There, the court noted: "It is . . . true that an officer of a corporation does not incur personal liability for its torts merely because of his official position. Where, however, an agent or officer commits or participates in the commission of a tort, whether or not he acts on behalf of his principal or corporation, he is liable to third persons injured thereby." Id., 404. The facts in *Scribner*, however, are distinguishable from those the trial court faced in the present case. In *Scribner*, the court found the defendant individually liable for acts committed in his individual capacity. Here, there is no evidence that any of the actions taken by D'Angelo were done in his individual as opposed to his corporate capacity.[25] The Cordovanos have failed to show that D'Angelo owed them any duty in his individual capacity or that D'Angelo

---

[25] Additionally, the Cordovanos did not attempt to pierce the corporate veil.

Development should be treated as the alter ego of D'Angelo. On the basis of the record before us, we do not conclude that D'Angelo owed the Cordovanos a duty of care in an individual capacity under the terms of the written contract between the Cordovanos and D'Angelo Development.

## IV

On cross appeal, D'Angelo Development claims that the court improperly determined that it was not entitled to recover on its claim of quantum meruit. We conclude that the record is inadequate to review the plaintiff's claim in this regard.

In the court's memorandum of decision, it concluded that "none of the parties [were] entitled to recover on any of their claims, counterclaims or cross claims . . . ." See footnote 2 of this opinion. It is clear from the court's conclusion that D'Angelo Development's claim for recovery for quantum meruit was denied. The court did not, however, explain the factual or legal basis for its decision. D'Angelo Development filed a motion for articulation of the court's reasoning, dated August 27, 2008, but the motion was denied. D'Angelo Development did not file a motion for review of the court's denial of its motion for articulation.

"It is well established that [i]t is the appellant's burden to provide an adequate record for review. . . . It is, therefore, the responsibility of the appellant to move for an articulation or rectification of the record where the trial court has failed to state the basis of a decision . . . ." (Internal quotation marks omitted.) *DuBaldo Electric, LLC* v. *Montagno Construction, Inc.*, 119 Conn. App. 423, 448, 988 A.2d 351 (2010); see also Practice Book § 61-10. "[W]here a party is dissatisfied with the trial court's response to a motion for articulation, he may, and indeed under appropriate circumstances he must, seek immediate appeal of the rectification

memorandum to this court via the motion for review." (Internal quotation marks omitted.) *Commission on Human Rights & Opportunities* v. *Brookstone Court, LLC,* 107 Conn. App. 340, 353, 945 A.2d 548, cert. denied, 288 Conn. 907, 953 A.2d 651 (2008). The court's memorandum of decision is devoid of any findings or analysis relating to the claim for quantum meruit, and the plaintiff has failed to present an adequate record for review. We can only assume from the court's judgment denying all claims that it found that D'Angelo Development was not entitled to recover on the basis of quantum meruit. Because we do not, however, know the basis of the court's determination, we are not in a position to assess its correctness. Nor can we say, from this record, that D'Angelo Development was entitled to this relief as a matter of law. Accordingly, we decline to review this claim.

V

D'Angelo Development, finally, claims on cross appeal that the court improperly concluded that it was not entitled to recover on its claims against the bonds that were substituted for the mechanic's liens.[26] We are not persuaded.

D'Angelo Development claims that the court incorrectly determined, based on the facts presented at trial, that it was not entitled to recover. "When . . . the trial court draws conclusions of law, our review is plenary and we must decide whether its conclusions are legally and logically correct and find support in the facts that appear in the record." (Internal quotation marks omitted.) *Key Air, Inc.* v. *Commissioner of Revenue Services,* 294 Conn. 225, 231, 983 A.2d 1 (2009).

---

[26] General Statutes § 49-37 (a) provides in relevant part: "Whenever a bond is substituted for any lien after an action for the foreclosure of a lien has been commenced, the plaintiff in the foreclosure may amend his complaint, without costs, so as to make the action one upon the bond with which the plaintiff may join an action to recover upon his claim. . . ."

It is relevant to our review to note that "[t]he purpose of the mechanic's lien is to give one who furnishes materials or services the security of the building and land for the payment of his claim by making such claim a lien thereon . . . ." *Intercity Development, LLC* v. *Andrade*, 286 Conn. 177, 183, 942 A.2d 1028 (2008). "[I]n a foreclosure of a mechanic's lien, a contractor is entitled to the value of the materials that it furnished or the services that it rendered in the construction of the project." *Intercity Development, LLC* v. *Andrade*, 96 Conn. App. 608, 613, 901 A.2d 731 (2006), rev'd in part on other grounds, 286 Conn. 177, 178, 942 A.2d 1028 (2008), citing General Statutes § 49-33 (a). Thus, in order for D'Angelo Development to recover on the bonds, it had to prove that it was entitled to the amounts secured by the bonds for materials and services rendered.

Although the court did not specifically discuss the legal basis on which it denied the claims for recovery on the bonds, it is clear from the court's memorandum of decision that it did not find a sufficient factual basis for such an award. In regard to the bond for $86,699.26, which represented the amount that D'Angelo Development claimed was due to various subcontractors, the court noted that D'Angelo testified at trial that no claims had been filed against D'Angelo Development by any of the subcontractors who had worked on the construction project in 2001 or 2002. The court also noted that at trial, although D'Angelo presented a spreadsheet listing the subcontractors and the corresponding total amounts that were due, he did not present any supporting materials to verify those amounts. Although D'Angelo claimed that he had statements and invoices to substantiate the amounts he claimed were owed to the subcontractors, on cross-examination, he was unable to produce any such evidence. Additionally, the court noted that D'Angelo Development produced no evidence that it possessed the authority to file the

mechanic's lien on behalf of the subcontractors or to pursue any claims on their behalf. It is clear from these facts that the court properly concluded that there was no factual basis on which to find that D'Angelo Development was entitled to recover on the bonds, which were to secure amounts allegedly owed to various subcontractors.

In regard to the bond for $72,606.59, which represented the amount D'Angelo Development claimed it was due for contractor's fees pursuant to the AIA contract and for costs it incurred directly under the AIA contract, the court correctly determined that D'Angelo Development could not recover on the bond. After the court declined to enforce the terms of the AIA contract due to mutual breaches by the parties, its conclusion that D'Angelo Development was not entitled to contractor's fees or costs arising from the AIA contract is logically and legally proper. Unable to enforce the provisions of the contract, D'Angelo Development had no basis for claiming entitlements based on the contract. Thus, we conclude that the court correctly declined to grant recovery on the bonds.

The judgments are affirmed.

In this opinion the other judges concurred.