JOHN D. WATTS *v.* HEATHER CHITTENDEN
(SC 18474)

Norcott, Palmer, Zarella, McLachlan, Eveleigh and Vertefeuille, Js.

Argued February 17—officially released July 19, 2011

*James F. Sullivan*, with whom, on the brief, was *Elizabeth S. Tanaka*, for the appellant (plaintiff).

*Michael S. Hillis*, for the appellee (defendant).

*Opinion*

EVELEIGH, J. The plaintiff, John D. Watts, appeals, following our grant of his petition for certification, from the judgment of the Appellate Court, which reversed the judgment of the trial court awarding the plaintiff damages for intentional infliction of emotional distress on the part of the defendant, Heather Chittenden. On appeal, the plaintiff claims that the Appellate Court improperly reversed the judgment of the trial court by concluding that the existence of an original duty must be established before applying the continuing course of conduct doctrine to toll the statute of limitations in a nonnegligence cause of action for intentional infliction of emotional distress. We agree with the plaintiff and, accordingly, reverse the judgment of the Appellate Court.

The Appellate Court opinion recites the following facts, as found by the trial court, and procedural history pertinent to the plaintiff's appeal. "The plaintiff and the defendant are former husband and wife. They were married in July, 1993; however, the defendant filed a dissolution of marriage action in the Superior Court in March, 1999. During the course of the marriage, the parties had two daughters, born in 1995 and 1996. Following the dissolution, the defendant was granted joint custody and visitation rights. Several days before the dissolution action was filed, the defendant transferred her children to a new pediatrician. Specifically, the children saw Janet Murphy, a nurse practitioner, whom the defendant, also a nurse practitioner, had met while a student in a class taught by Murphy on the subject of sexual molestation of children.

"At approximately 10:30 p.m. on June 3, 1999, the defendant [telephoned] the department of children and families (department) to report that her eldest daughter had been abused sexually by the plaintiff. These allegations were then relayed by the department to the state police. The same report was also made by the defendant to Dawn Torres, a pediatrician. Thereafter, on June 10, 1999, the defendant met with [Anthony Buglione and James McGlynn, detectives with] the state police and reiterated her report that her daughter had been abused sexually by the plaintiff. She gave a five page written statement to the police providing details of her claims. Following this report, the state police contacted the plaintiff and requested pubic hair samples to be used in connection with the criminal investigation. On July 1, 1999, the investigation concluded in the absence of any evidence to suggest that the plaintiff was abusing his daughter.

"On July 21, 1999, McGlynn received another report from the department, which was based on new allegations made by the defendant regarding the plaintiff's abuse of their eldest daughter. On August 19, 1999, the defendant told McGlynn that the plaintiff continued to abuse their daughter, and, as a result, the investigation was reopened. During the course of the investigation, the daughter was evaluated by the Yale Child Sexual Abuse Clinic at Yale-New Haven Hospital (clinic). The clinic reported that the daughter indicated repeatedly during interviews that the plaintiff had not abused her. She did relate, however, that the defendant had been touching her vaginal area and saying, 'this is what daddy does.' The investigation stemming from this complaint was closed on January 11, 2000.

"Shortly thereafter, on January 19, 2000, the department received a report from Livia Orsis-Abdo, a physician in Southport, who stated that she had been told by the parties' youngest daughter that the plaintiff had

abused her sexually. As a result, the investigation against the plaintiff was reopened once again. The police eventually concluded that there was no evidence to support the allegations against the plaintiff but that there was substantial evidence that the defendant had sexually abused her two daughters while telling them that it 'was what daddy [did].'

"As a result of the investigation, the defendant was arrested and charged in a substitute information with two counts of risk of injury to a child in violation of General Statutes (Rev. to 1999) § 53-21 (1) and (2), false reporting of an incident in violation of General Statutes (Rev. to 1999) § 53a-180 (a) (3) (A), false statement in the second degree in violation of General Statutes § 53a-157b, attempt to commit malicious prosecution in violation of General Statutes §§ 53a-49 (a) (2) and 53-39, and sexual assault in the fourth degree in violation of General Statutes (Rev. to 1999) § 53a-73a (a) (1). On April 11, 2002, the defendant pleaded guilty, as a part of a plea agreement, to falsely reporting an incident and attempt to commit malicious prosecution. In the statement of facts read into the record by the prosecutor, the defendant acknowledged that the allegations of sexual abuse asserted against the plaintiff were false and that the defendant made the false reports in an effort to have the plaintiff arrested. On May 30, 2002, the defendant was sentenced to a term of one year incarceration, execution suspended, and three years probation on each count.

"Following her guilty plea on April 11, 2002, the defendant made repeated accusations to family therapists regarding the plaintiff's continuing sexual abuse of his daughters. Specifically, in 2004, she told Nina Rossamondo, a family therapist, that the plaintiff had abused sexually one or more of his children. In May, 2006, she also told Peter Kossef, a family therapist, that the plaintiff had molested the eldest daughter at least once.

"On August 29, 2005, the plaintiff filed a one count complaint sounding in intentional infliction of emotional distress. The defendant filed an answer on October 20, 2005, in which she asserted as a special defense that the action was time barred under the statute of limitations. The plaintiff filed a reply, denying this special defense on May 22, 2006. On June 11, 2007, the plaintiff sought, and was granted, request for leave to amend his complaint to conform the pleadings to the proof by asserting the specific manner in which the defendant's tortious conduct continued to 2006. Subsequently, the defendant amended her special defenses on September 20, 2007, to assert that the statements she made were privileged and that the claims were barred by the statute of limitations. The plaintiff filed a general denial to the defendant's amended special defenses on October 31, 2007.

"A trial before the court was conducted on May 1 and 2, June 11 and September 20, 2007. The court found in favor of the plaintiff on January 25, 2008 . . . ." *Watts* v. *Chittenden*, 115 Conn. App. 404, 406–408, 972 A.2d 770 (2009). In doing so, the trial court rejected the defendant's special defense that the plaintiff's cause of action was barred by the statute of limitations. Specifically, the trial court determined that the plaintiff's claim was based on a continuing course of conduct by the defendant and that this continuing course of conduct tolled the statute of limitations.[1] The defendant then appealed from the judgment of the trial court to the Appellate Court.

On appeal to the Appellate Court, the defendant claimed, inter alia, that the trial court improperly con-

[1] The trial court also concluded that the statute of limitations was tolled by the defendant's filing of the petition in bankruptcy. Because we conclude that the continuing course of conduct doctrine tolled the statute of limitations during the entire period of the defendant's course of conduct, which continued into 2006, we need not address whether the defendant's bankruptcy petition also tolled the statute of limitations.

cluded that the plaintiff's claim was not time barred because: (1) the plaintiff did not submit any evidence of actionable conduct within the period of time prescribed to bring a claim for intentional infliction of emotional distress; and (2) the continuing course of conduct doctrine does not serve to toll the applicable statute of limitations in this intentional infliction of emotional distress claim. Id., 409. The Appellate Court agreed with the defendant, concluding that application of the continuing course of conduct doctrine "is premised necessarily on the existence of a duty in effect at the time of the original wrong." Id., 410. The Appellate Court reversed the judgment of the trial court concluding that the plaintiff had failed to prove the existence of a cognizable duty and that, "[i]n the absence of a breach of a cognizable duty . . . the [trial] court improperly applied the continuing course of conduct doctrine to toll the statute of limitations." Id., 413.

Thereafter, the plaintiff sought certification to appeal from the judgment of the Appellate Court. We granted the plaintiff's petition for certification to appeal, limited to the following issues: "1. Whether the Appellate Court, based on the record before it, properly reversed the trial court's decision by holding that the existence of an original duty must be determined before applying the continuing course of conduct doctrine to toll the statute of limitations in a nonnegligence cause of action for intentional infliction of emotional distress?

"2. Assuming that the Appellate Court [properly] held that the existence of an original duty must be determined before applying the continuing course of conduct doctrine, whether that court properly determined that

there was no duty in this case?"[2] *Watts* v. *Chittenden*, 293 Conn. 932, 932–33, 981 A.2d 1077 (2009).

On appeal to this court, the plaintiff asserts that the Appellate Court improperly concluded that the existence of an original duty must be established before applying the continuing course of conduct doctrine to toll the statute of limitations in a nonnegligence cause of action for intentional infliction of emotional distress. Specifically, the plaintiff claims that because duty is not an element of a cause of action for intentional infliction of emotional distress, it is not logical to require a plaintiff to establish the existence of a duty of care in order to apply the continuing course of conduct doctrine to such a claim. In response, the defendant claims that the Appellate Court properly concluded that an original duty must be established before applying the continuing course of conduct doctrine to toll the statute of limitations in a nonnegligence case. Specifically, the defendant asserts that it is necessary to require proof of a duty of care to apply the continuing course of conduct doctrine in order to avoid vexatious litigation and restrain the application of the doctrine to within a reasonable scope. We agree with the plaintiff and therefore reverse the judgment of the Appellate Court.

"The question of whether a party's claim is barred by the statute of limitations is a question of law, which this court reviews de novo." (Internal quotation marks omitted.) *Certain Underwriters at Lloyd's, London* v. *Cooperman*, 289 Conn. 383, 407–408, 957 A.2d 836 (2008). The parties in the present case do not dispute that the plaintiff's claim is governed by the tort statute

---

[2] Because we conclude that the Appellate Court improperly concluded that the existence of an original duty must be determined before applying the continuing course of conduct doctrine to toll the statute of limitations in a nonnegligence cause of action for intentional infliction of emotional distress, we need not address the second certified issue.

of limitations set forth in General Statutes § 52-577. Section 52-577 provides: "No action founded upon a tort shall be brought but within three years from the date of the act or omission complained of." "In construing our general tort statute of limitations . . . we have concluded that the history of that legislative choice of language precludes any construction thereof delaying the start of the limitation period until the cause of action has accrued or the injury has occurred." *Fichera* v. *Mine Hill Corp.*, 207 Conn. 204, 212, 541 A.2d 472 (1988). "The date of the act or omission complained of is the date when the . . . conduct of the defendant occurs . . . ." *Vilcinskas* v. *Sears, Roebuck & Co.*, 144 Conn. 170, 173, 127 A.2d 814 (1956); see also *Valentine* v. *LaBow*, 95 Conn. App. 436, 445 n.8, 897 A.2d 624 ("§ 52-577 is an occurrence statute and . . . its limitation period does not begin when the plaintiff first discovers an injury" [internal quotation marks omitted]), cert. denied, 280 Conn. 933, 909 A.2d 963 (2006).

We begin with a brief overview of the continuing course of conduct doctrine. This court has recognized the continuing course of conduct doctrine in many cases involving claims sounding in negligence. For instance, we have recognized the continuing course of conduct doctrine in claims of medical malpractice. See, e.g., *Martinelli* v. *Fusi*, 290 Conn. 347, 355–56, 963 A.2d 640 (2009) ("[w]e have recognized . . . that the statute of limitations and period of repose contained in [General Statutes] § 52-584 may be tolled, in the proper circumstances, under either the continuous course of conduct doctrine or the continuing treatment doctrine, thereby allowing a plaintiff to bring an action more than three years after the commission of the negligent act or omission complained of"). In doing so, we noted that "[t]he continuing course of conduct doctrine reflects the policy that, during an ongoing relationship, lawsuits are premature because specific tortious acts or omis-

sions may be difficult to identify and may yet be remedied." Id., 356. The continuing course of conduct doctrine has also been applied to other claims of professional negligence in this state. See, e.g., *Vanliner Ins. Co.* v. *Fay*, 98 Conn. App. 125, 139–42, 907 A.2d 1220 (2006) (applying continuing course of conduct doctrine to legal malpractice action); see also *Handler* v. *Remington Arms Co.*, 144 Conn. 316, 321, 130 A.2d 793 (1957) (statute of limitations tolled by defendant manufacturer's continuing failure to warn of potential danger associated with inherently dangerous cartridge of ammunition).

In these negligence actions, this court has "held that in order [t]o support a finding of a continuing course of conduct that may toll the statute of limitations there must be evidence of the breach of a duty that remained in existence after commission of the original wrong related thereto. That duty must not have terminated prior to commencement of the period allowed for bringing an action for such a wrong. . . . Where we have upheld a finding that a duty continued to exist after the cessation of the act or omission relied upon, there has been evidence of either a special relationship between the parties giving rise to such a continuing duty or some later wrongful conduct of a defendant related to the prior act. *Fichera* v. *Mine Hill Corp.*, supra, 207 Conn. 209–10 (no evidence to support continuing duty on part of defendant after property sold); see, e.g., *Connell* v. *Colwell*, [214 Conn. 242, 571 A.2d 116 (1990)] (improper reliance on theory [by plaintiff in medical malpractice action]); *Beckenstein* v. *Potter & Carrier, Inc.*, 191 Conn. 150, 464 A.2d 18 (1983) (no continuing duty on defendant's part after completion of roof installation); *Prokolkin* v. *General Motors Corp.*, [170 Conn. 289, 299, 365 A.2d 1180 (1976)] (continuing course of conduct theory inappropriate in strict product liability action); *Handler* v. *Remington Arms Co.*, supra, 144 Conn. 316

(applying continuing course of conduct doctrine to toll statute of limitations on . . . basis of continuing duty to warn of defective cartridge by manufacturer); *Vilcinskas* v. *Sears, Roebuck & Co.*, [supra, 144 Conn. 174] (continuing course of conduct inapplicable where act completed by sale of air rifle). . . . *Blanchette* v. *Barrett*, [229 Conn. 256, 275–76, 640 A.2d 74 (1994)].

"Therefore, a precondition for the operation of the continuing course of conduct doctrine is that the defendant must have committed an initial wrong upon the plaintiff. . . .

"A second requirement for the operation of the continuing course of conduct doctrine is that there must be evidence of the breach of a duty that remained in existence after commission of the original wrong related thereto. . . . *Blanchette* v. *Barrett*, supra, 229 Conn. 275. This court has held this requirement to be satisfied when there was wrongful conduct of a defendant related to the prior act. . . .

"Finally, in *Blanchette* and [*Cross* v. *Huttenlocher*, 185 Conn. 390, 440 A.2d 952 (1981)], the plaintiffs presented expert testimony that the defendants' omissions amounted to a breach of the standard of care. See *Blanchette* v. *Barrett*, supra, 229 Conn. 279 ([t]he testimony of the plaintiff's expert witness . . . which the jury might have found credible, was sufficient for the jury to find not only . . . a continuing duty on the part of the defendant . . . but also continuing negligence on the part of the defendant based upon a breach of his professional duty of care to the plaintiff); *Cross* v. *Huttenlocher*, supra, [402] (plaintiff presented expert testimony that, if credited by the jury, could have been sufficient to make out a case of negligent failure to warn)." (Citations omitted; internal quotation marks omitted.) *Sherwood* v. *Danbury Hospital*, 252 Conn. 193, 203–205, 746 A.2d 730 (2000).

This court has not, however, addressed whether the existence of an original duty is necessary in order to apply the continuing course of conduct doctrine to a claim of intentional infliction of emotional distress. The defendant asserts, and the Appellate Court concluded, that this court's previous cases requiring the existence of an original duty to apply the continuing course of conduct doctrine to actions for negligence necessitate the conclusion that the existence of an original duty is necessary to apply the continuing course of conduct doctrine to a claim of intentional infliction of emotional distress. We disagree.

"In order for the plaintiff to prevail in a case for liability under . . . [intentional infliction of emotional distress], four elements must be established. It must be shown: (1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe." (Internal quotation marks omitted.) *Appleton* v. *Board of Education*, 254 Conn. 205, 210, 757 A.2d 1059 (2000). Unlike a claim based on negligence, therefore, the existence of a duty is not a required element for establishing liability for intentional infliction of emotional distress. We conclude, therefore, that the existence of an original duty is not necessary to apply the continuing course of conduct doctrine to a claim for intentional infliction of emotional distress.

In concluding that the trial court improperly applied the continuing course of conduct doctrine in the absence of a cognizable duty, the Appellate Court relied on *Smulewicz-Zucker* v. *Zucker*, 98 Conn. App. 419, 423–24, 909 A.2d 76 (2006), cert. denied, 281 Conn. 905, 916 A.2d 45 (2007). In *Smulewicz-Zucker*, the Appellate

Court refused to apply the continuing course of conduct doctrine to a claim of intentional infliction of emotional distress by the plaintiff for the conduct of the defendant, her former husband. Id., 422–25. In doing so, the Appellate Court rejected the plaintiff's claim that the defendant owed a " 'fiduciary like' " duty to the plaintiff because of their spousal relationship, particularly when their marriage was dissolved more than three years prior to the plaintiff's filing of her action for intentional infliction of emotional distress. Id., 423–25. We disagree with the defendant's reliance on *Smulewicz-Zucker*. In *Smulewicz-Zucker*, the plaintiff did not claim that the existence of an original duty is not necessary in order to apply the continuing violation doctrine to toll the statute of limitations in a cause of action for intentional infliction of emotional distress. In the present case, the plaintiff specifically claims, and we agree that the existence of an original duty is not necessary to apply the continuing course of conduct doctrine in an action for intentional infliction of emotional distress. Thus, to the extent that *Smulewicz-Zucker* required the existence of an original duty to apply the continuing course of conduct doctrine to toll the statute of limitations in an action for intentional infliction of emotional distress, it is overruled.

Our conclusion that the existence of an original duty is not necessary for the application of the continuing course of conduct doctrine is bolstered by a review of the nature and use of the continuous course of conduct doctrine in other jurisdictions.

In examining the use of the continuing course of conduct doctrine, we are mindful of the nature of the doctrine as Chief Judge Richard Posner of the Seventh Circuit Court of Appeals has explained: "A violation is called 'continuing,' signifying that a plaintiff can reach back to its beginning even if that beginning lies outside the statutory limitations period, when it would be unrea-

sonable to require or even permit him to sue separately over every incident of the defendant's unlawful conduct. The injuries about which the plaintiff is complaining in [these] case[s] are the consequence of a numerous and continuous series of events. . . . When a single event gives rise to continuing injuries . . . the plaintiff can bring a single suit based on an estimation of his total injuries, and that mode of proceeding is much to be preferred to piecemeal litigation despite the possible loss in accuracy. But in [cases in which the continuing course of conduct doctrine is applicable, each incident increases the plaintiff's injury]. Not only would it be unreasonable to require him, as a condition of preserving his right to have [the full limitations period] to sue . . . to bring separate suits [during the limitations period] after each [incident giving rise to the claim]; but it would impose an unreasonable burden on the courts to entertain an indefinite number of suits and apportion damages among them.

"In between the case in which a single event gives rise to continuing injuries and the case in which a continuous series of events gives rise to a cumulative injury is the case in which repeated events give rise to discrete injuries, as in suits for lost wages. If our plaintiff were seeking backpay for repeated acts of wage discrimination (suppose that every pay day for five years he had received $100 less than he was entitled to), he would not be permitted to reach back to the first by suing within the limitations period for the last. E.g., *Knight* v. [*Columbus*], 19 F.3d 579, 581–82 (11th Cir. 1994); *Pollis* v. *New School for Social Research*, 132 F.3d 115, 119 (2d Cir. 1997); see also *Thomas* v. *Denny's, Inc.*, 111 F.3d 1506, 1513 (10th Cir. 1997); *Ashley* v. *Boyle's Famous Corned Beef Co.*, 66 F.3d 164, 168 (8th Cir. 1995) (en banc). As emphasized in *Pollis*, the damages from each discrete act of discrimination would be readily calculable without waiting for the entire series

of acts to end. There would be no excuse for the delay. And so the violation would not be deemed 'continuing.' The present case is different. It would [be] impractical to allocate [a plaintiff's injury] day by day across the period during which [the continuing course of conduct occurred]." (Citations omitted.) *Heard* v. *Sheahan*, 253 F.3d 316, 319–20 (7th Cir. 2001).

Chief Judge Posner has further explained: "The principle strikes a balance between the plaintiff's interest in being spared having to bring successive suits, and the two distinct interests, *Gates Rubber Co.* v. *USM Corp.*, 508 F.2d 603, 611 (7th Cir. 1975), that statutes of limitations serve. One is evidentiary—to reduce the error rate in legal proceedings by barring litigation over claims relating to the distant past. The other is repose— to give people the assurance that after a fixed time they can go about their business without fear of having their liberty or property taken through the legal process. Apart from the harmful effect of uncertainty on planning, it is more painful to lose what you have come to think of as your own than it is gratifying to get back something you wrote off many years ago and have grown accustomed to doing without. See [O. Holmes, 'The Path of the Law'], 10 Harv. L. Rev. 457, 477 (1897); cf. [J. Hirshleifer, Price Theory and Applications (Prentice-Hall, 1976), p. 61]. When the final act of an unlawful course of conduct occurs within the statutory period, these purposes are adequately served, in balance with the plaintiff's interest in not having to bring successive suits, by requiring the plaintiff to sue within the statutory period but letting him reach back and get damages for the entire duration of the alleged violation. Some of the evidence, at least, will be fresh. And the defendant's uncertainty as to whether he will be sued at all will be confined to the statutory period. His uncertainty about the extent of his liability may be greater, but that is

often true in litigation." *Taylor* v. *Meirick*, 712 F.2d 1112, 1119 (7th Cir. 1983).

The continuing violation doctrine has been recognized and applied in many contexts over the last century. For instance, for more than one century, many jurisdictions have recognized the continuous nature of the tort of seduction without any requirement that the plaintiff establish the existence of an original duty. These jurisdictions have recognized that, although a plaintiff may file an action after the first act of tortious intercourse, the plaintiff is allowed to file a claim at any time until the expiration of the limitations period following the last act of tortious intercourse. See, e.g., *Gunder* v. *Tibbits*, 153 Ind. 591, 604–605, 55 N.E. 762 (1899); *Breiner* v. *Nugent*, 136 Iowa 322, 327–29, 111 N.W. 446 (1907); *Russell* v. *Chambers*, 31 Minn. 54, 54–55, 16 N.W. 458 (1883); *Davis* v. *Young*, 90 Tenn. 303, 304–305, 16 S.W. 473 (1891).

In doing so, these courts have recognized that claims of seduction usually involve a period when the defendant exercised such control over the plaintiff that the plaintiff did not have the ability to bring an action. The Indiana Supreme Court explained the rationale for treating seduction under the continuing course of conduct doctrine as follows: "If an act is done under any sort of constraint, plain justice forbids the defendant to count the time of his control as a part of the period of limitations." *Gunder* v. *Tibbits*, supra, 153 Ind. 605.

In *Davis* v. *Young*, supra, 90 Tenn. 304–305, the Tennessee Supreme Court further explained: "[T]he seduction is made up of the several violations by the defendant, and he will not be permitted to confine [the victim's] remedy to the first illicit act, as the only one of seduction, and, when sued, relieve himself by showing that first act to have occurred [beyond the limitations period]. Such limitation places it in the power of

the unprincipled to effect the ruin of the confiding female, and then, by flattering the confidence and hopes of his victim, persevere in her debauchery at his will, and at last ignore all his cruel deceptions of the meantime, and insult the disgrace he has brought about by pleading the [statute of limitations] as applicable to the first act in his series of villainy. It should never be that one, by confessing his infamy, may by multiplying the evidences of that infamy, acquit himself from accountability for its consequences."

The use of the continuing course of conduct doctrine to toll the statute of limitations in seduction cases demonstrates two important public policy considerations underlying this doctrine. First, courts have determined that it would be inequitable for the limitations period to begin to run when a plaintiff is incapable of bringing an action because he or she is under the control of the defendant and is thus unable to bring an action. Second, as we have recognized in professional malpractice actions, these cases also demonstrate that it may serve the interest of judicial economy to toll the statute of limitations in cases involving such close personal relationships in order to allow the involved parties the opportunity to work out their dispute rather than requiring a plaintiff to commence an action immediately. See, e.g., *Martinelli* v. *Fusi*, supra, 290 Conn. 354 ("[t]he continuing course of conduct doctrine reflects the policy that, during an ongoing relationship, lawsuits are premature because specific tortious acts or omissions may be difficult to identify and may yet be remedied" [internal quotation marks omitted]).

In more recent years, courts have continued to recognize the continuing course of conduct doctrine in cases involving close intimate relationships between spouses and cohabiting couples without requiring the existence of any original duty. The Court of Appeals of Texas applied the continuing course of conduct doctrine to

toll the statute of limitations in an action by a plaintiff against the defendant, her former husband, for negligent infliction of emotional distress based on the defendant's repeated attempts to coerce her to join in deviant sexual acts during their marriage. *Twyman* v. *Twyman*, 790 S.W.2d 819 (Tex. App. 1990). In doing so, the court recognized that "[a] continuing tort is one inflicted over a period of time; it involves a wrongful conduct that is repeated until desisted, and each day creates a separate cause of action. [54 C.J.S. 231, Limitations of Actions § 177 (1987)]. This case does not involve acts that are complete in themselves . . . but involves a continuing course of conduct which over a period of years caused injury. Since usually no single incident in a continuous chain of tortious activity can fairly or realistically be identified as the cause of significant harm, it seems proper to regard the cumulative effect of the conduct as actionable." (Citation omitted; internal quotation marks omitted.) *Twyman* v. *Twyman*, supra, 821.

The Idaho Supreme Court has also applied the continuing course of conduct doctrine to toll the statute of limitations for a claim of intentional infliction of emotional distress by a female plaintiff against the defendant, her former male cohabitant. *Curtis* v. *Firth*, 123 Idaho 598, 850 P.2d 749 (1993). In applying the continuing course of conduct doctrine to the claim for intentional infliction of emotional distress for the first time, the Idaho Supreme Court acknowledged that it had applied the continuing course of conduct doctrine to toll the statute of limitations in various other contexts and that these cases demonstrated that "a tort should be analyzed for the purposes of time limitations according to whether it is simply one complete act with ensuing damages, or whether it consists of a series of continuous activities." Id., 602. The Idaho Supreme Court further recognized that "the definition of intentional infliction of emotional distress requires that there

must be a causal connection between the wrongful conduct and the emotional distress, and the emotional distress must be severe. . . . By its very nature this tort will often involve a series of acts over a period of time, rather than one single act causing severe emotional distress. For that reason we recognize the concept of continuing tort . . . should be extended to apply in other limited contexts, including particularly intentional infliction of emotional distress. We note, however, that embracing this concept in the area of intentional or negligent infliction of emotional distress does not throw open the doors to permit filing these actions at any time. The courts which have adopted this continuing tort theory have generally stated that the statute of limitations is only held in abeyance until the tortious acts cease. . . . At that point the statute begins to run. If at some point after the statute has run the tortious acts begin again, a new cause of action may arise, but only as to those damages which have accrued since the new tortious conduct began." (Citations omitted.) Id., 604.

The Illinois Supreme Court has also recognized the application of the continuing course of conduct doctrine to toll the statute of limitations in a claim by a plaintiff against the defendant, her former husband, for intentional infliction of emotional distress. In *Feltmeier v. Feltmeier*, 207 Ill. 2d 263, 798 N.E.2d 75 (2003), the plaintiff and the defendant had been married for approximately ten years. Id., 265. Approximately twenty months after the parties' marriage was dissolved, the plaintiff brought an action against the defendant, alleging that he had engaged in a pattern of physical and mental abuse, which began shortly after their marriage and continued past its dissolution. Id. The defendant filed a motion to dismiss the plaintiff's complaint on the ground that almost all of the alleged conduct contained in her complaint took place outside the applica-

ble two year statute of limitations. Id., 277–78. The Illinois Supreme Court noted that "[a] continuing tort . . . does not involve tolling the statute of limitations because of delayed or continuing injuries, but instead involves viewing the defendant's conduct as a continuous whole for prescriptive purposes." Id., 279. The court in *Feltmeier* relied on an Illinois Appellate Court opinion wherein the Appellate Court had reversed the dismissal of a claim of intentional infliction of emotional distress because "the plaintiff had alleged an ongoing campaign of offensive and outrageous sexual pursuit that established a continuing series of tortious behavior, by the same actor, and of a similar nature, such that the limitations period did not commence until the last act occurred or the conduct abated." Id., 281–82, citing *Pavlik* v. *Kornhaber*, 326 Ill. App. 3d 731, 761 N.E.2d 175 (2001). The Illinois Supreme Court further relied on the reasoning in *Pavlik* that "Illinois courts have said that in many contexts . . . repetition of the behavior may be a critical factor in raising offensive acts to actionably outrageous ones. . . . It may be the pattern, course and accumulation of acts that make the conduct sufficiently extreme to be actionable, whereas one instance of such behavior might not be. [See Restatement (Second), Torts, Emotional Distress § 46, comment (j), pp. 77–78 (1965)] (noting that the intensity and duration of the distress may determine whether a pattern of behavior is actionable). It would be logically inconsistent to say that each act must be independently actionable while at the same time asserting that often it is the cumulative nature of the acts that gives rise to the intentional infliction of emotional distress. Likewise, we cannot say that cumulative continuous acts may be required to constitute the tort but that prescription runs from the date of the first act. . . . Because it is impossible to pinpoint the specific moment when enough conduct has occurred to become actionable, the

termination of the conduct provides the most sensible place to begin the running of the prescriptive period." (Citations omitted; internal quotation marks omitted.) *Feltmeier* v. *Feltmeier*, supra, 282.

The Illinois Supreme Court further recognized that "[t]he purpose behind a statute of limitations is to prevent stale claims, not to preclude claims before they are ripe for adjudication . . . and certainly not to shield a wrongdoer . . . ." (Citation omitted.) Id., 283. Accordingly, the court agreed "with the growing number of jurisdictions that have found that the continuing tort rule should be extended to apply in cases of intentional infliction of emotional distress."[3] Id., 284.

Nevertheless, the court in *Feltmeier* warned that "embracing the concept of a continuing tort in the area of intentional infliction of emotional distress 'does not throw open the doors to permit filing these actions at any time.' *Curtis* [v. *Firth*, supra, 123 Idaho 604]. As with any continuing tort, the statute of limitations is only held in abeyance until the date of the last injury suffered or when the tortious acts cease." *Feltmeier* v. *Feltmeier*, supra, 207 Ill. 2d 284.

Our review of the nature and use of the continuing course of conduct doctrine in other jurisdictions con-

---

[3] It is also important to note that similar reasoning has been employed to allow a woman with battered woman's syndrome to sue her spouse in tort for injuries sustained as a result of continuous acts of battering during the parties' marriage. See *Cusseaux* v. *Pickett*, 279 N.J. Super. 335, 345, 652 A.2d 789 (1994) ("Because the battered-woman's syndrome is the result of a continuing pattern of abuse and violent behavior that causes continuing damage, it must be treated in the same way as a continuing tort. It would be contrary to the public policy of this [s]tate, not to mention cruel, to limit recovery to only those individual incidents of assault and battery for which the applicable statute of limitations has not yet run. The mate who is responsible for creating the condition suffered by the battered victim must be made to account for his actions—all of his actions. Failure to allow affirmative recovery under these circumstances would be tantamount to the courts condoning the continued abusive treatment of women in the domestic sphere. This the courts cannot and will never do.").

firms that public policy interests weigh in favor of applying the continuing course of conduct doctrine to toll the statute of limitations for a claim of intentional infliction of emotional distress without requiring the existence of an original duty. Therefore, we hold today that, in the context of cases involving only the intentional infliction of emotional distress, the existence of an original duty is not necessary to apply the continuing course of conduct doctrine. We further hold that, although we recognize the continuing course of conduct doctrine in cases of intentional infliction of emotional distress, we further recognize that at some point there must be a limitation on the ability to file an action to recover for such conduct. Therefore, in such cases, if no conduct has occurred within the three year limitations period set forth in § 52-577, the plaintiff will be barred from recovering for the prior actions of intentional infliction of emotional distress. If, however, additional actions occur within the limitations period, the ability to bring an action will be further extended.[4] In the

[4] The dissent proposes two factual scenarios in which the continuing course of conduct doctrine should be applied to claims for intentional infliction of emotional distress, namely, when: "(1) the extreme and outrageous nature of the defendant's misconduct, as well as the severity of the plaintiff's distress, does not arise from a single instance of that misconduct, but only from repeated instances, which are continuous and unbroken; or (2) the misconduct arises in the context of a spousal or spouse-like abusive relationship." In either circumstance, the dissent would "conclude that the limitations period begins to run upon the completion of the final wrongful action."

We agree with the dissent that the limitations period begins to run upon the completion of the final wrongful action. Indeed, we conclude herein that if no conduct has occurred within the three year period of limitations under § 52-577, the plaintiff will be barred from recovery for the prior actions of intentional infliction of emotional distress.

We disagree, however, with the dissent's proposal that the continuing course of conduct doctrine should apply only if "the extreme and outrageous nature of the defendant's misconduct, as well as the severity of the plaintiff's distress, does not arise from a single instance of that misconduct, but only from repeated instances, which are continuous and unbroken . . . ." In fact, we conclude that such a requirement would be contrary to the purpose for the application of the continuing course of conduct doctrine. As we

present case, the trial court found that the defendant's

recognize herein, not only would it be unreasonable to require a plaintiff to bring separate causes of action during the limitations period after each extreme and outrageous incident giving rise to the claim in order to preserve his right to sue, but it would also impose an unreasonable burden on the courts to entertain an indefinite number of actions and, later, to apportion damages among them. Instead, as we have concluded herein, because it is almost impossible to pinpoint the specific moment when enough conduct has occurred to become actionable, the termination of the conduct provides the most sensible time at which to commence the running of the limitations period, even when one single incident is extreme and outrageous and causes the plaintiff severe distress.

Finally, we also disagree with the dissent's suggestion that if the extreme and outrageous nature of the defendant's misconduct and the severity of the plaintiff's distress arises from a single incident of that misconduct, the continuing course of conduct doctrine should only expressly apply if "the misconduct arises in the context of a spousal or spouse-like, abusive relationship." Under those circumstances, we see no reason to limit the doctrine to a certain class of individuals or certain types of relationships. Although the dissent recognizes the possibility that the doctrine could apply with respect to other relationships, it limits its application to the situation wherein "the nexus between the coercive and abusive nature of the relationship and the plaintiff's delay in bringing the action . . . supports the application of the doctrine . . . ." See footnote 4 of the dissenting opinion. Certainly, the intentional infliction of emotional distress doctrine contains no such restriction by way of relationship. We suggest, by way of example and not limitation, the following relationships, which may be fraught with the potential for intentional infliction of emotional distress, yet are not a spousal or spouse-like relationship: teacher-student, coach-player, physician-patient, social worker-client, employer-employee, and caregiver-child. Indeed, to place a limitation on the continuing course of conduct doctrine, when no such limitation exists in the intentional infliction of emotional distress doctrine, is to ignore the vast variety of human relationships wherein the intentional infliction of emotional distress doctrine has been applied and, based upon our conclusion herein, the continuing course of conduct doctrine should also apply.

The dissent also asserts that "[t]hus far, spousal or spouse-like abusive relationships are the types of relationships in which courts have applied the doctrine on the basis of these equitable principles." Id. We disagree. Courts have repeatedly applied the continuing course of conduct doctrine to claims of intentional infliction of emotional distress arising in many different types of relationships. See, e.g., *Pleveritis* v. *Chicago*, United States District Court, Docket No. 06 C 3401 (N.D. Ill. September 17, 2007) (applying continuing course of conduct doctrine to claim of intentional infliction of emotional distress by individual against police department and individual officers); *Hill* v. *Chicago*, United States District Court, Docket No. 06 C

conduct continued from June 3, 1999, until her guilty plea on April 11, 2002. In 2004, the defendant made an additional report of sexual abuse. The present action was commenced on August 29, 2005. Further, in May, 2006, the defendant made an additional report of sexual abuse. At no time, as found by the trial court, was there a gap of three years between the reports of sexual abuse reported by the defendant against the plaintiff. Therefore, we agree with the ruling of the trial court, which rejected the defendant's special defense alleging that the statute of limitations had expired.

We conclude, therefore, that the Appellate Court improperly reversed the judgment of the trial court on the ground that the trial court improperly applied the continuing course of conduct doctrine to toll the statute of limitations in this case because of the absence of a breach of a cognizable duty.

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to affirm the judgment of the trial court.

In this opinion NORCOTT, PALMER and VERTE-FEUILLE, Js., concurred.

McLACHLAN, J., with whom ZARELLA, J., joins, dissenting. I disagree with the majority's conclusion that the continuing course of conduct doctrine applies generally to all claims for intentional infliction of emotional distress. Because the continuing course of conduct doctrine is an exception to the general rule that the statute

---

6772 (N.D. Ill. May 10, 2007) (applying continuing course of conduct doctrine to claim of intentional infliction of emotional distress by estate of deceased prisoner against city); *McCorkle* v. *McCorkle*, 811 So. 2d 258, 264 (Miss. App. 2001) (applying continuing course of conduct doctrine to claim of intentional infliction of emotional distress by father against son); *Cabaness* v. *Thomas*, 232 P.3d 486, 497 (Utah 2010) (applying continuing course of conduct doctrine to claim of intentional infliction of emotional distress by employee against supervisors).

of limitations begins to run at the time that a tortfeasor commits a single, wrongful act, to date we have narrowly applied the doctrine to a limited category of negligence actions. What the majority proposes to do today—broadly extending the continuing course of conduct doctrine to claims for intentional infliction of emotional distress without imposing any limitations or restraints—represents a departure from that well established practice, which is both, in my view, significant and unnecessary. Because sweeping changes in the law unnecessarily risk unanticipated and unintended effects, I believe that, when we extend the scope of an existing rule, we must tailor such changes narrowly, to the facts presented. Accordingly, before extending the doctrine to claims for intentional infliction of emotional distress, it is necessary to engage in a thorough consideration of the relevant, competing public policies. Such consideration enables us to examine whether the doctrine should be applied to claims for intentional infliction of emotional distress, and, if so, what rules should guide that application. Moreover, even if it were prudent to extend the continuing course of conduct doctrine to claims for intentional infliction of emotional distress in some instances, the application of the doctrine to the present case would be inappropriate. Therefore, I dissent.

I begin with a preliminary observation. Although our certified question states that the issue on appeal is whether the existence of an original duty is a prerequisite for the application of the continuing course of conduct doctrine to a claim for intentional infliction of emotional distress; *Watts* v. *Chittenden*, 293 Conn. 932, 981 A.2d 1077 (2009); the real question before us is whether we should extend our application of that doctrine to claims for intentional infliction of emotional distress. Because intentional infliction claims *never* require a demonstration of a duty, the question of

whether an original duty must exist before a court may apply the continuing course of conduct doctrine to a claim for intentional infliction of emotional distress obscures the actual question presented in this appeal. Therefore, I would frame the question presented as whether we should extend the continuing course of conduct doctrine to claims for intentional infliction of emotional distress.

Although I reframe it, I believe that the certified question—whether the doctrine applies to claims for intentional infliction of emotional distress absent the existence of an original, and, I would add, continuing duty—highlights one of the analytical difficulties presented in this appeal and also provides a helpful guide in delineating the appropriate rule. The difficulty is that in determining whether the doctrine applies to negligence actions we have relied on a concept that has little utility in the realm of intentional torts—continuing duty. Although that concept is not helpful in determining whether to apply the doctrine in the intentional tort context, it is nonetheless instructive to review our application of the doctrine in the negligence context, with particular focus on how we have determined whether a continuing duty existed. We have looked to subsequent wrongful acts related to the original wrong, or, in the alternative, examined whether a special relationship existed that gave rise to a continuing duty. See, e.g., *Witt* v. *St. Vincent's Medical Center*, 252 Conn. 363, 371, 746 A.2d 753 (2000); *Fichera* v. *Mine Hill Corp.*, 207 Conn. 204, 210, 541 A.2d 472 (1988). The first of these two inquiries appears to me to focus on the question of when the cause of action accrued, implicitly suggesting that, at least under certain circumstances, accrual does not occur until the repeated wrongful actions cease. The second inquiry focuses on the nature of the relationship between the parties, inferring the existence of a duty therefrom. I propose a similar

approach to the application of the doctrine to claims for intentional infliction of emotional distress. Specifically, I would conclude that the continuing course of conduct doctrine applies to claims for intentional infliction of emotional distress in either of the two factual scenarios: (1) the extreme and outrageous nature of the defendant's misconduct, as well as the severity of the plaintiff's distress, does not arise from a single instance of that misconduct, but only from repeated instances, which are continuous and unbroken; or (2) the misconduct arises in the context of a spousal or spouse-like abusive relationship.[1] In either circumstance, I would conclude that the limitations period begins to run upon the completion of the final wrongful action. To explain why I believe this approach is the appropriate one, I begin by examining the public policy principles that underlie the application of the continuing course of conduct doctrine, starting with the public policy principles underlying the statute of limitations.

The statute of limitations is grounded in principles of both efficiency and fairness. Its purpose is "to promote finality in the litigation process . . . and give a defendant the peace of mind that comes with knowing that its potential liability has been extinguished." (Citation omitted; internal quotation marks omitted.) *Cweklinsky* v. *Mobil Chemical Co.*, 267 Conn. 210, 224, 837 A.2d 759 (2004). We additionally have explained that, "[t]he enactment of [s]tatutes limiting the time within which an action may be brought are the result of a legitimate legislative determination which balances the rights and duties of competing groups. . . . A statute of limitation

---

[1] Although I expressly would extend the application of the doctrine to the context of spousal or spouse-like relationships, I recognize that other special relationships may exist that would support the application of the doctrine. Thus, it is possible that this second factual circumstance could be broadened, where the special nature of some other type of relationship would discourage litigation while the relationship continues. See footnote 4 of this dissenting opinion.

or of repose is designed to (1) prevent the unexpected enforcement of stale and fraudulent claims by allowing persons after the lapse of a reasonable time, to plan their affairs with a reasonable degree of certainty, free from the disruptive burden of protracted and unknown potential liability, and (2) to aid in the search for truth that may be impaired by the loss of evidence, whether by death or disappearance of witnesses, fading memories, disappearance of documents or otherwise." (Internal quotation marks omitted.) *St. Paul Travelers Cos.* v. *Kuehl*, 299 Conn. 800, 809–10, 12 A.3d 852 (2011).

In some instances, strict application of the statute of limitations may yield inequitable, and even inefficient results. For that reason, we have recognized limited exceptions to the ordinary rule that the limitations period begins to run upon the commission of the alleged tort. One of those exceptions, the continuing course of conduct doctrine, aggregates a series of actions by a tortfeasor for purposes of the limitations period, viewing the series of acts as an indivisible whole for that limited purpose. The practical effect is that "[w]hen the wrong sued upon *consists* of a continuing course of conduct, the statute does not begin to run until that course of conduct is completed." (Emphasis added.) *Handler* v. *Remington Arms Co.*, 144 Conn. 316, 321, 130 A.2d 793 (1957); see also *Beckenstein* v. *Potter & Carrier, Inc.*, 191 Conn. 150, 161, 464 A.2d 18 (1983); *Giglio* v. *Connecticut Light & Power Co.*, 180 Conn. 230, 241, 429 A.2d 486 (1980). Put another way, the continuing course of conduct doctrine redefines the point in time at which the cause of action accrues. See K. Graham, "The Continuing Violations Doctrine," 43 Gonz. L. Rev. 271, 279–80 (2007/2008) (comparing continuing course of conduct doctrine with other exceptions to statute of limitations and noting that continuing course of conduct doctrine takes "more drastic step of

redefining the very claim or claims as to which the limitations period or periods apply").

Understanding the effect of the doctrine is only part of our task. It is also essential to understand *why*, in some instances, it is appropriate to understand a cause of action to accrue only upon the completion of a series of wrongful acts, as compared to other instances, in which those actions are understood as a series of discrete actions, each giving rise to a separate cause of action. We have explained that the application of the continuing course of conduct doctrine reflects the policy that "during an ongoing relationship, lawsuits are premature because specific tortious acts or omissions may be difficult to identify and may yet be remedied." *Blanchette* v. *Barrett*, 229 Conn. 256, 276, 640 A.2d 74 (1994). This statement reveals that the public policy principles supporting the application of the continuing course of conduct doctrine are, like those supporting the application of the statute of limitations generally, grounded in principles of both efficiency and equity. As the foregoing quotation illustrates, the concerns that have driven the application of the doctrine have been the following: the relative difficulty of identifying the cause of action, the possibility that the wrong may be remedied before the course of conduct is completed, and the general concern of avoiding premature litigation.

Beyond that single, often repeated public policy statement, we have not explored the principles of efficiency and equity that drive the continuing course of conduct doctrine. Because our application of the doctrine has remained fairly restricted, it has been unnecessary to further explore the relevant public policy principles. In determining whether and to what extent to expand the doctrine, however, a more detailed analysis is warranted.

Of course, not every case that involves repeated instances of misconduct triggers the application of the continuing course of conduct doctrine. Something more than mere repetition is required to swing the balance in favor of delaying the accrual of the cause of action. See, e.g., *Fichera* v. *Mine Hill Corp.*, supra, 207 Conn. 210 (requiring existence of continuing duty). Judge Posner's decision in *Heard* v. *Sheahan*, 253 F.3d 316, 319 (7th Cir. 2001), identifies the primary characteristic that distinguishes a continuing course of conduct from a series of actions that are merely repetitious: "A violation is called 'continuing,' signifying that a plaintiff can reach back to its beginning even if that beginning lies outside the statutory limitations period, when it would be unreasonable to require or even permit him to sue separately over every incident of the defendant's unlawful conduct." The violation is continuing, Judge Posner explains, when the risk of piecemeal litigation, which would "impose an unreasonable burden on the courts to entertain an indefinite number of suits and apportion damages among them"; id., 320; outweighs concerns regarding the "possible loss in accuracy." Id., 319. The rule seeks to maximize both equity and efficiency.

The practical question remains—at what point do principles of efficiency and equity tip the balance in favor of delaying the accrual of the cause of action? In determining what factual circumstances will distinguish discrete wrongful acts that are merely repetitious and do not justify a departure from the traditional application of the statute of limitations from a series of wrongful actions that constitute a continuing course of conduct, we have looked to the nature of the tort at issue. For instance, in the negligence context, we have limited its application to circumstances in which the plaintiff can demonstrate the existence of a "breach of a duty that remained in existence after commission of the original wrong related thereto. That duty must not

have terminated prior to commencement of the period allowed for bringing an action for such a wrong. . . . Where we have upheld a finding that a duty continued to exist after the cessation of the act or omission relied upon, there has been evidence of either a special relationship between the parties giving rise to such a continuing duty or some later wrongful conduct of a defendant related to the prior act." (Internal quotation marks omitted.) *Blanchette* v. *Barrett*, supra, 229 Conn. 275. The elements of the tort of negligence have guided our framing of the appropriate test for the application of the continuing course of conduct doctrine. That is, in determining whether the doctrine applies, our inquiry inevitably has focused on whether there exists a continuing duty. See, e.g., *Bednarz* v. *Eye Physicians of Central Connecticut, P.C.*, 287 Conn. 158, 164, 947 A.2d 291 (2008). Similarly, we should look to the elements of the tort of intentional infliction of emotional distress to determine in which instances, if any, the continuing course of conduct doctrine should apply to those claims.

In order to prevail upon a claim for intentional infliction of emotional distress, a plaintiff must establish: "(1) that the [defendant] intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe." (Internal quotation marks omitted.) *Appleton* v. *Board of Education*, 254 Conn. 205, 210, 757 A.2d 1059 (2000). Courts that have applied the continuing course of conduct doctrine to claims for intentional infliction of emotional distress have done so on the ground that it is the repetition of the misconduct that makes it extreme and outrageous. See, e.g., *Feltmeier* v. *Feltmeier*, 207 Ill. 2d 263, 282,

798 N.E.2d 75 (2003) ("[R]epetition of the behavior may be a critical factor in raising offensive acts to actionably outrageous ones. . . . It may be the pattern, course and accumulation of acts that make the conduct sufficiently extreme to be actionable, whereas one instance of such behavior might not be." [Internal quotation marks omitted.]). Other courts have made similar observations regarding the requirement that the emotional distress sustained must be severe. See, e.g., *Curtis* v. *Firth*, 123 Idaho 598, 604, 850 P.2d 749 (1993) ("[b]y its very nature this tort will *often* involve a series of acts over a period of time, rather than one single act causing severe emotional distress" [emphasis added]). In other words, because it is often the repetition of the misconduct and the cumulative effect of repeated instances of the misconduct on the plaintiff that make the behavior tortious, the cause of action against the defendant does not accrue until the misconduct has recurred a sufficient number of times to render the actions extreme and outrageous and the emotional distress severe.

The reasonable inquiry that emerges as a means to discern whether the continuing course of conduct doctrine applies to a claim for intentional infliction of emotional distress is whether both the extreme and outrageous nature of the conduct as well as the severity of the emotional distress derive not from a single wrongful act, but from the cumulative effect of repeated instances of the misconduct over time. I emphasize that in evaluating whether the cause of action has accrued following a single instance of misconduct, the question is not whether a plaintiff would prevail, but whether a plaintiff would have a colorable claim that the behavior was extreme and outrageous and that the emotional distress was severe. The overarching goal in engaging in that inquiry should be to determine whether principles of efficiency and equity are best served by treating

each action separately for purposes of the statute of limitations or by aggregating those actions pursuant to the continuing course of conduct doctrine. To that end, we should examine the facts of the particular case to determine whether the plaintiff's cause of action reasonably accrued at the time that the defendant committed each discrete wrongful act, or only when she had completed the last wrongful act. This approach is consistent with the fact that "the application of the continuing course of conduct doctrine [is] conspicuously factbound." (Internal quotation marks omitted.) *Sherwood* v. *Danbury Hospital*, 252 Conn. 193, 210, 746 A.2d 730 (2000).

This approach also is consistent with the public policy principles underlying the statute of limitations. The limitation of the application of the doctrine to those instances in which the outrageous nature of the misconduct and the severity of the plaintiff's emotional distress do not arise from a single, initial instance of misconduct, but rather derive from the repetition of the misconduct, avoids subjecting defendants to unending potential liability. The majority's broad application of the doctrine runs afoul of that basic policy principle and does not protect defendants against "the unexpected enforcement of stale and fraudulent claims by allowing persons after the lapse of a reasonable time, to plan their affairs with a reasonable degree of certainty, free from the disruptive burden of protracted and unknown potential liability . . . ." (Internal quotation marks omitted.) *St. Paul Travelers Cos.* v. *Kuehl*, supra, 299 Conn. 810.

I begin with the facts as found by the trial court and set forth by the Appellate Court, up to and including the first incident at issue in the present appeal. "The plaintiff [John D. Watts] and the defendant [Heather Chittenden] are former husband and wife. They were married in July, 1993; however, the defendant filed a dissolution of marriage action in the Superior Court in

March, 1999. During the course of the marriage, the parties had two daughters, born in 1995 and 1996. Following the dissolution, the defendant was granted joint custody and visitation rights. Several days before the dissolution action was filed, the defendant transferred her children to a new pediatrician. Specifically, the children saw Janet Murphy, a nurse practitioner, whom the defendant, also a nurse practitioner, had met while a student in a class taught by Murphy on the subject of sexual molestation of children." *Watts* v. *Chittenden*, 115 Conn. App. 404, 406, 972 A.2d 770 (2009). Although not expressly found by the trial court, it was also undisputed at trial that in May, 1999, the defendant made an initial allegation of sexual abuse to Murphy, who was a mandated reporter, a fact that was known to the defendant. It was unclear from the record whether the defendant alleged to Murphy that the plaintiff had abused only one or both of the children. It was later revealed that the defendant had lied.

It is clear that this single incident satisfied the stringent standard we have set in order to find that conduct is extreme and outrageous. That is, the conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, Outrageous!" (Internal quotation marks omitted.) *Morrissey* v. *Yale University*, 268 Conn. 426, 428, 844 A.2d 853 (2004). A mere summary statement of that conduct is sufficient to elicit the required exclamation from the average reader: the defendant falsely accused her soon to be former husband of sexually abusing one or both of their young daughters, for whatever motive.

Although the trial court found that the distress that the plaintiff suffered as a result of all of the defendant's actions was severe, it did not make any specific finding regarding the degree of the plaintiff's emotional distress immediately following the May, 1999 incident. The plaintiff had testified, however, that following the May incident, he felt "terrible" and was frightened that he would lose his job or go to jail, and worried that others would believe the defendant's false allegations. He also was worried that his children would be unable to tell the truth. On the advice of his child's attorney, he had a third person present with him at all times when he was with his children—his sister slept in the home and his mother accompanied him when he drove the children to day care. He began seeing a therapist after that first incident. A reasonable inference can be drawn that the plaintiff already suffered severe emotional distress at that time. I would be compelled to conclude, therefore, that the plaintiff's cause of action accrued in May, 1999, when the defendant made her first false allegation against him, and that the statute of limitations began to run at that time.

Even if I were to conclude that the plaintiff's cause of action had not accrued upon the defendant's first accusation, I would conclude that it had accrued by the time that the defendant pleaded guilty in the related criminal case. The following additional facts are relevant. "At approximately 10:30 p.m. on June 3, 1999, the defendant called the department of children and families (department) to report that her eldest daughter had been abused sexually by the plaintiff. These allegations were then relayed by the department to the state police. The same report was also made by the defendant to Dawn Torres, a pediatrician. Thereafter, on June 10, 1999, the defendant met with Detective Anthony Buglione and Detective James McGlynn of the state police and reiterated her report that her daughter had

been abused sexually by the plaintiff. She gave a five page written statement to the police providing details of her claims. Following this report, the state police contacted the plaintiff and requested pubic hair samples to be used in connection with the criminal investigation. On July 1, 1999, the investigation concluded in the absence of any evidence to suggest that the plaintiff was abusing his daughter.

"On July 21, 1999, McGlynn received another report from the department, which was based on new allegations made by the defendant regarding the plaintiff's abuse of their eldest daughter. On August 19, 1999, the defendant told McGlynn that the plaintiff continued to abuse their daughter, and, as a result, the investigation was reopened. During the course of the investigation, the daughter was evaluated by the Yale Child Sexual Abuse Clinic at Yale-New Haven Hospital (clinic). The clinic reported that the daughter indicated repeatedly during interviews that the plaintiff had not abused her. She did relate, however, that the defendant had been touching her vaginal area and saying, 'this is what daddy does.' The investigation stemming from this complaint was closed on January 11, 2000.

"Shortly thereafter, on January 19, 2000, the department received a report from Livia Orsis-Abdo, a physician in Southport, who stated that she had been told by the parties' youngest daughter that the plaintiff had abused her sexually. As a result, the investigation against the plaintiff was reopened once again. The police eventually concluded that there was no evidence to support the allegations against the plaintiff but that there was substantial evidence that the defendant had sexually abused her two daughters while telling them that it 'was what daddy [did].' " *Watts* v. *Chittenden*, supra, 115 Conn. App. 406–407.

On April 11, 2002, the defendant pleaded guilty to falsely reporting an incident and attempt to commit

malicious prosecution. Id., 407. At that time, she admitted that her prior allegations about the plaintiff were false and that she had made the false reports in an attempt to have the plaintiff arrested. Id., 407–408. At that point in time, it cannot be reasonably debated that the defendant's actions were extreme and outrageous— she not only falsely had accused the father of her children of sexually abusing them, but also had sexually abused the children herself in furtherance of her plan. Such conduct is far outside the bounds of decency. In addition, with respect to the severity of the plaintiff's distress, there was evidence that the plaintiff's employer, a law firm, had expressed its dissatisfaction with the plaintiff's involvement in the affair and its concern that the firm's name would come to be associated with the story. As a result, the plaintiff left his employment with the firm. Additionally, the plaintiff testified that he was distressed when his daughter returned home following a court-ordered sexual assault test and the child had black and blue marks on her arms. His distress was amplified because of his duty to protect his children and his awareness that the children were being traumatized as part of the defendant's campaign to place him in jail. The plaintiff further testified that as a result of the false allegations, he lost sleep, waking up in the middle of the night thinking about the "nightmare," and ground his teeth at night. By that point in time, the plaintiff had endured false accusations for three years, lost his job, learned that the defendant had sexually abused the children and witnessed the further traumatization of the children by the ensuing investigations. By April 11, 2002, the plaintiff had a very colorable claim that his emotional distress was severe.

The defendant's guilty plea acknowledged all of the facts necessary to enable the plaintiff to bring an action for intentional infliction of emotional distress. The plaintiff's cause of action at that point unarguably had

accrued. Following that plea, however, the plaintiff took no action. Two years passed, and in 2004, during family therapy, in the presence of the therapist, the defendant reiterated her belief that the plaintiff had abused the children. Two more years passed, and in 2006, the defendant again made a similar statement while they were in family therapy with a different therapist. When the plaintiff brought the present action on August 29, 2005, all of the defendant's preconviction actions were beyond the scope of the statute of limitations. Application of the continuing course of conduct doctrine to the present case requires that we view the *entire* series of events as a continuous course of conduct. I do not believe that the series of events may be understood in that manner. I conclude that the gap in time between the guilty plea and the defendant's statements during therapy in 2004 is sufficiently long to support the conclusion that, even if I were to view the defendant's actions from 1999 up to her guilty plea in 2002 to comprise a single course of conduct—which I do not—that course of conduct would end with the defendant's guilty plea. The defendant's statements in 2004 gave rise to a separate cause of action.

Other jurisdictions have recognized that a course of conduct ceases when followed by a significant gap before the misconduct resumes. In *Feltmeier* v. *Feltmeier*, supra, 207 Ill. 2d 265, a decision relied on by the majority, the Supreme Court of Illinois applied the continuing course of conduct doctrine to a former wife's claim for intentional infliction of emotional distress against her abusive former husband, for his abusive conduct during the marriage. The court utilized an accrual theory in applying the continuing course of conduct doctrine to the facts of the case, stating that "a continuing tort does not involve tolling the statute of limitations because of delayed or continuing injuries, but instead involves viewing the defendant's conduct

as a continuous whole for prescriptive purposes." Id., 285. The court noted, however, that "embracing the concept of a continuing tort in the area of intentional infliction of emotional distress does not throw open the doors to permit filing these actions at any time." (Internal quotation marks omitted.) Id., 284. The court emphasized repeatedly that, in order to constitute a continuing course of conduct, the tortious acts must constitute a "single, continuous, *unbroken*, violation or wrong . . . ." (Emphasis added; internal quotation marks omitted.) Id., 281. *Feltmeier* relied in part on *Curtis* v. *Firth*, supra, 123 Idaho 598, another decision on which the majority opinion relies. In *Curtis*, a woman sued her former domestic partner[2] for intentional infliction of emotional distress in connection with his abuse of her while they had been living together. Id., 600–601. The court stated that when the continuing course of conduct doctrine is applied, "the statute of limitations is only held in abeyance until the tortious acts cease. . . . At that point the statute begins to run. If at some point after the statute has run the tortious acts begin again, a new cause of action may arise, but only as to those damages which have accrued since the new tortious conduct began." (Citations omitted.) Id., 604.

Ordinarily, when a course of conduct ceases and is followed by a gap, the statute of limitations is tolled if the tortfeasor engages in the misconduct before the limitations period has run. In other words, the usual rule is that a gap in activities must be longer than the limitations period in order for subsequent incidents to give rise to a new cause of action. This appeal, however, presents a rather unique circumstance. Unlike *Feltmeier* and *Curtis*, the present case involves conduct that is broken, not only by a lapse in time, but also,

---

[2] The precise legal status of their relationship had been in dispute. *Curtis* v. *Firth*, supra, 123 Idaho 600–601.

and even more importantly, by the defendant's guilty plea. At that point, the defendant's tortious acts ceased, and the statute of limitations began to run. In other words, once the defendant pleaded guilty and acknowledged not only that she committed the tortious acts, but did so with malicious intent, the plaintiff's cause of action had accrued. This is not a case, like *Feltmeier*, where the statute of limitations is being employed to preclude a claim before it is "ripe for adjudication . . . ." (Citations omitted.) *Feltmeier* v. *Feltmeier*, supra, 207 Ill. 2d 283. All of the elements of the plaintiff's cause of action were present and known to him upon the first occurrence in May, 1999, and had accrued beyond argument when the defendant pleaded guilty on April 11, 2002. There was no difficulty at either point in time in identifying the cause of action. Any application of the continuing course of conduct doctrine that relies on an accrual theory cannot, therefore, apply to these facts.[3]

I emphasize that, notwithstanding my conclusion that the plaintiff's cause of action had accrued as of the first incident, I would conclude that the continuing course of conduct doctrine applied to his claim for intentional infliction of emotional distress if he had been the victim in an abusive, spousal or spouse-like relationship and had delayed bringing an action for intentional infliction of emotional distress until the abuse ceased or the relationship ended. The present case, however, is distinguishable from both *Feltmeier* and *Curtis*, which both involved an abusive relationship between the plaintiff

---

[3] Although it may seem that the rule I have set forth in this dissent would foreclose a fact finder from considering the defendant's preconviction conduct, that is not the case. The nature of the tort of intentional infliction of emotional distress, consistent with the general rule that a tortfeasor takes a plaintiff as he finds him, requires the fact finder to consider the mental and emotional state of the victim. Thus, even though the misconduct that was beyond the limitations period would not be compensable, the prior misconduct may be admissible.

and the defendant, the nature of which appears to have influenced those courts to apply the continuing course of conduct doctrine.

Although the nature of the parties' relationship does not support the application of the continuing course of conduct doctrine in the present case, I believe it is worthwhile briefly to set forth the equitable principles that support the application of the doctrine in the context of domestic violence cases. It would be inequitable to allow an abuser to benefit legally from the control he exercised over the victim by being able to prevent her—by virtue of the nature of the ongoing abuse in the relationship—from seeking a legal remedy, then claiming that her delay bars a subsequent action.[4] See, e.g., *Giovine* v. *Giovine*, 284 N.J. Super. 3, 13, 663 A.2d 109 (App. Div. 1995) (on application of continuing course of conduct doctrine to former wife's claim for intentional infliction of emotional distress against abusive former husband: "a wife diagnosed with battered woman's syndrome should be permitted to sue her spouse in tort for the physical and emotional injuries sustained by continuous acts of battering during the course of the marriage, *provided* there is medical, psychiatric, or psychological expert testimony establishing that the wife was caused to have an inability to take

[4] As I previously have indicated; see footnote 1 of this dissenting opinion; I leave open the possibility that a different type of relationship could implicate the same equitable principles that support the application of the doctrine to spousal or spouse-like abusive relationships. It is particularly the nexus between the coercive and abusive nature of the relationship and the plaintiff's delay in bringing the action that supports the application of the doctrine in the spousal or spouse-like context. The current, express application of the doctrine to spousal or spouse-like abusive relationships is the result of the simple, practical consideration that I am unwilling, in a factual vacuum, to anticipate when the continuing course of conduct doctrine should be applied. Thus far, spousal or spouse-like abusive relationships are the types of relationships in which courts have applied the doctrine on the basis of these equitable principles. See, e.g., *Curtis* v. *Firth*, supra, 123 Idaho 598; *Feltmeier* v. *Feltmeier*, supra, 207 Ill. 2d 263.

any action to improve or alter the situation unilaterally . . . [and] [i]n the absence of expert proof, the wife cannot be deemed to be suffering from battered woman's syndrome, and each act of abuse during the marriage would constitute a separate and distinct cause of action in tort, subject to the statute of limitations" [citation omitted; emphasis in original; internal quotation marks omitted]). The application of the doctrine also allows the parties the opportunity to resolve the problem absent litigation and preserve the possibility of repairing the relationship.

Nothing in the record of the present case suggests that the relationship between the plaintiff and the defendant is of the type that triggers the application of the continuing course of conduct doctrine to a claim for intentional infliction of emotional distress. The plaintiff does not argue that the nature of his relationship with the defendant in any way prevented him from being able to bring this action within the limitations period, nor is there any evidence in the record that indicates that the nature of the relationship between the parties was abusive. Moreover, by the time the wrongful conduct began, a dissolution action was pending, the parties had separated and there was no spousal or spouselike relationship to preserve. Therefore, I do not believe that the nature of the relationship between the plaintiff and the defendant supports the application of the doctrine to the present case.

For the foregoing reasons, I would affirm the judgment of the Appellate Court.[5]

---

[5] The defendant did not challenge on appeal the trial court's conclusion that the statute of limitations was tolled by the defendant's bankruptcy petition, filed on April 8, 2005. *Watts* v. *Chittenden*, supra, 115 Conn. App. 410. Because I conclude that the three year limitations period began to run in May, 1999, the trial court's unchallenged conclusion regarding the effect of the bankruptcy petition has no effect on my analysis.